NATIONAL CHEMSEARCH CORPORATION OF NEW YORK, Inc.

v.

Alfred L. BOGATIN and Madison Chemical Corporation.

Civ. A. No. 35801.

United States District Court
E. D. Pennsylvania.

Aug. 21, 1964.

Schnader, Harrison, Segal & Lewis, Frank B. Murdoch, Bancroft D. Haviland, Philadelphia, Pa., for plaintiff.

LaBrum & Doak, Edward C. German, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

Plaintiff, National Chemsearch Corporation of New York, Inc., (Chemsearch), is a Texas Corporation with its principal place of business in Dallas, Texas. Defendant, Alfred L. Bogatin (Bogatin), is a citizen of Pennsylvania and defendant, Madison Chemical Corporation (Madison), is an Illinois corporation with its principal place of business in Maywood, Illinois. Jurisdiction is founded upon diversity of citizenship in the requisite jurisdictional amount.[1]

This is a business piracy case in which plaintiff seeks a preliminary injunction [2] to restrain its former salesman, Bogatin, from violating certain provisions of his written employment contract with it which provided, inter alia, that Bogatin would not solicit or divert Chemsearch's customers in the territory which he previously covered for Chemsearch. Plaintiff also seeks injunctive relief against Madison, Bogatin's present employer, for conspiring with and inducing Bogatin to breach the foregoing contract.

In addition to the contract and conspiracy claims, plaintiff also seeks relief against both defendants on the theory of unfair competition for unlawful divulgence and receipt of trade secrets. However, since I find that the defend-

---

[1] Defendants made a belated assertion that the jurisdictional amount was not established. However, an analysis of the amount of business which the plaintiffs either lost or may lose in the future indicates that the monetary requirements of 28 U.S.C., § 1332 are satisfied. See St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Wade v. Rogala, 270 F.2d 280 (3rd Cir. 1959); Blair and Co., Inc. v. Shober, et al., 35 F.R.D. 533 (E.D.Pa.1964), decided on July 22, 1964.

[2] Plaintiff also seeks damages, but not at the preliminary injunction stage.

ants are liable on the first two grounds, it is not necessary to reach the question of unfair competition.

For the purposes of the preliminary injunction, I make the following findings of fact:

Both Chemsearch and Madison are engaged in what is known as the "chemical specialties business." [3] The products which they merchandise generally perform similar functions and are competitive. The chemical specialty business itself is highly competitive and operates, for the most part, by direct selling; the success or failure of an individual company in the field depends to a great degree upon the training, technique, and abilities of its individual salesmen and, also, upon the extent to which they are able to establish a continuing relationship with customers in the areas they serve. To build a competent sales force, Chemsearch has a well developed selection process for salesmen, as well as a detailed training program, including training aids, product guides, training in the field, and periodic sales analysis and training meetings. These items and techniques as well as the customer lists of Chemsearch are considered by it to be confidential. The customer lists in the form of black route books contain lists of customers, times called, sales made, likes, dislikes and interests of the customers, and products bought in the past. Because of the investment in each salesman's training, and the direct nature of his contacts, Chemsearch required each of its salesmen to sign a written employment agreement containing a restrictive covenant. Chemsearch has established a valuable and extensive trade in its products and a valuable good will among its customers.

In January of 1962, Bogatin made application to Chemsearch for employment as a salesman and, after being interviewed and taking the aptitude tests mentioned above, was told that Chem-

search was interested in employing him. Prior to coming with Chemsearch, Bogatin had no experience selling chemical specialties and no experience selling in the territory which would subsequently be assigned to him. In discussing the terms of employment with Bogatin, it was agreed that he would undergo a week of training, after which he would become an employee of Chemsearch upon the execution of a written agreement of employment and would receive customer lists and other sales aids. After five days of training in which he received no commissions or customer lists, Bogatin signed the agreement on February 9, 1962. The terms were explained to him and Bogatin was fully aware that all Chemsearch salesmen were required to sign such contract, and that he would not become a Chemsearch salesman until he signed it.

The agreement was under seal and stated $1.00 consideration as well as any "other good and valuable consideration * * * paid by Company to Representative." It was agreed therein that the employment relation could be terminated at any time by *either* party *without notice*. Bogatin also agreed that the following restrictive covenants were reasonable and necessary to the protection of Chemsearch's business and that the contract "shall be construed under and governed by the laws of the STATE OF TEXAS." The agreement stipulated that the following eight counties in Pennsylvania were assigned to Bogatin: Miflin, Juniata, Perry, Cumberland, Franklin, Adams, Huntingdon and Fulton. In return for employment, training, customer lists, and selling aids, Bogatin covenanted that for a period of one year after the termination of his employment with Chemsearch:

(1) " * * * he will not * * * for himself or on behalf of other * * * firm(s), sell or solicit the sale of disinfectants, soaps, cleaners, chemical specialties, insecticides,

---

**3.** This business includes the selling and distribution of disinfectants, soaps, cleaners, insecticides, sanitary supplies, and floor maintenance materials and equipment to industrial and commercial users.

degreasing and sanitary supply and floor maintenance materials and equipment within the assigned territory. * * *

(2) " * * * he will not in any way, directly or indirectly, for himself or in conjunction with any * * * firm(s) * * * divert or * * * attempt to take away any of [Chemsearch's] customers * *.

(3) " * * * he will not * * * directly or indirectly, act as a sales agent * * * or as an advisor or consultant to any firm engaged in the distribution or sale of [the aforementioned products] * * * within the assigned territory. * * * In the event of the violation by Representative of any one or more of the covenants contained in this paragraph [Nos. 1, 2, 3 above], it is agreed that the term of each such covenant so violated shall be automatically extended for a period of one year from the date on which Representative permanently ceases such violation or for a period of one year from the date of entry by a court of competent jurisdiction of an order or judgment enforcing such covenant(s), whichever period is later."

In addition, Bogatin agreed not to divulge or use for his own benefit any confidential information obtained during the course of his employment and expressly recognized in the contract that such confidential information should include sales volume and strategy, number and location of sales representatives, and names and lists of Chemsearch's customers. See Appendix for complete agreement.

Such restrictive covenants for salesmen are customary in the chemical specialty business, and defendant-Madison utilizes an even broader covenant in connection with its salesmen.

After Bogatin signed the agreement on February 9, 1962, he was given customer lists and sales aids, and he proceeded to sell in the eight-county area[4] in central Pennsylvania until January 20, 1964, when he left Chemsearch to go with Madison. Bogatin's gross commissions were $11,500 in 1962 and $16,500 in 1963. During the period of his employment, Bogatin was the principal contact of Chemsearch with its customers in the eight county territory and became familiar with their specific problems and was able to form a close relationship with such customers.

On January 20, 1964, Bogatin terminated his employment with Chemsearch and entered the employ of Madison as a "field training representative," a position which he continues to hold at the present time. Bogatin described this position as working with salesmen, going over their territory with them and assisting them in sales and problems. As early as January 23, 1964, Bogatin began to solicit and contact customers in the eight county territory. During the period from February 1964, until at least June 12, 1964— this suit was instituted on May 18, 1964 —Bogatin made a series of sales of Madison products to various accounts he had formerly sold as customers of Chemsearch in the eight county area. In each instance, Bogatin attempted to conceal the fact that he had made such sale by putting the name of another employee of Madison on the order.

In addition to these sales, Bogatin made many other calls on former Chemsearch customers in the eight county area, solicited sales, advised the customers of his association with Madison, and charged the expenses to Madison as a business expense. Bogatin took officers of Madison with him to many of these customers and they were introduced as employees of Madison who might be contacting them for sales in the future. Bogatin also advised Madison of the names of the customers he formerly served for Chemsearch and personally sent Madison catalogs to many former

4. Bogatin also made sales for Chemsearch in the City of Harrisburg (Dauphin County)—not in the eight-county area— and received commissions therefor until he terminated his employment.

and potential customers of Chemsearch in the eight-county area. These acts of Bogatin were done with the knowledge of Madison, and were participated in by Madison will full knowledge of the restrictive covenants between Chemsearch and Bogatin. In evaluating conflicts of testimony and inferences to be drawn therefrom, the singular lack of candor on the part of Bogatin has led me to discredit much of his direct testimony.

I

## DOING BUSINESS IN PENNSYLVANIA

At the outset, defendants contend that plaintiff is "doing business" in Pennsylvania without having registered with the Department of State and hence may not institute a suit in *contract* in this Court [5] under the provisions of Article X of the Business Corporation Act.

Under § 1014 of Article X of the Business Corporation Act,[6] captioned "Penalty for doing business without certificate of authority," it is provided that "[a]ny foreign business corporation which is required by the provisions of this act to procure a certificate of authority, but has not done so * * *" shall not institute an action on any contract in the Courts of Pennsylvania until the corporation obtains a certificate of authority.[7] This Section refers to § 1001 of the same Article which sets forth the circumstances in which a certificate of authority is required to be obtained:

> "A foreign business corporation, before *doing any business* in this Commonwealth, shall procure a certificate of authority to do so from the Department of State, * * * unless the entire business operations of the corporation within this Com-

monwealth are within the protection of the Commerce Clause of the Federal Constitution * * *." [8] (Emphasis added.)

The question, therefore, is whether plaintiff is doing business within the meaning of § 1001.

Plaintiff's activities in Pennsylvania consist of solicitation by salesmen for orders for chemical specialty products manufactured in Dallas, Texas. The orders are subject to approval or rejection in Dallas and the *salesmen have no authority to bind Chemsearch to any contract in Pennsylvania.* If approved, the merchandise is shipped direct from Dallas to the customer and the customer is billed from and pays directly to Dallas, Texas.

Chemsearch has held at least one sales meeting in Pennsylvania and at times the salesmen endeavor to collect delinquent accounts. Chemsearch has no office in Pennsylvania and no property other than samples and training and promotional material in the hands of individual salesmen. Chemsearch has 20 salesmen in Pennsylvania who solicited $846,146.78 in business for the period April 30, 1962 to April 30, 1963, and $1,087,601.95 for the period April 30, 1963 to April 30, 1964. It has no certificate of authority to do business in Pennsylvania.

Although there are no Pennsylvania cases in point construing the meaning of "doing business" under the Registration Section (§ 1001), analogous cases show that a greater nexus must exist than is present in the instant case.

In Lutz v. Foster & Kester Co., Inc., 367 Pa. 125, 129, 79 A.2d 222, 224 (1951), the Pennsylvania Supreme Court stated "that the mere solicitation of busi-

---

5. Of course this argument has no application to the non-contract conspiracy and unfair competition counts.

6. Act of May 5, 1933, P.L. 364, Art. X, § 1014, as amended, 15 P.S. § 2852–1014.

7. In Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), the Supreme Court indicated

that the federal courts sitting in diversity of citizenship cases must apply this type of state statute governing access to the courts. Cf. Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947).

8. Act of May 5, 1933, P.L. 364, Art. X, § 1001; 15 P.S. § 2852–1001.

ness within the Commonwealth did not constitute 'doing business' [under the service of process section (§ 1011) of Article X]. There must be 'other activities' in addition to the solicitation of business * * *. Such 'other activities' do not consist of * * * the number of solicitors employed or the character and extent of the facilities provided them for carrying on their solicitations such as office space and office equipment * *. *The criterion is, rather, whether the local solicitors have authority to bind the foreign corporation by which they are employed.*[9] (Emphasis added.) In Lutz, the contacts with Pennsylvania were much greater than in the instant case, with the plaintiff maintaining an office and considerable property in the state.

The standards set forth in Lutz and Law, supra, both service of process cases, were reiterated in Motch v. Merryweather Machinery Co. v. Pittsburgh School District, 381 Pa. 619, 116 A.2d 733 (1955), where the Court held that the rent of an office and office equipment, the extensive solicitation of orders, and the follow-up of orders and customer complaints in Pennsylvania did not constitute doing business in this State for the purpose of taxation.

■ Since the salesmen in the instant case did not have authority to bind plaintiff to sales contracts in Pennsylvania, and the degree of contact herein is less than in the above-cited cases, the plaintiff is not doing business within the meaning of § 1001.

However, defendants cite a different line of cases,[10] all construing the 1959 amendment to the *Service of Process* Section of Article X which established the so-called "pecuniary benefit" test of doing business. This amendment and the cases applying it are not in point.

As amended by new subsection C, § 1011 reads in pertinent part as follows:

"Section 1011. Service of Process Upon the Secretary of the Commonwealth.—

* * * * * *

"C. For the purposes of this section, the entry of any corporation into this Commonwealth for the doing of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object, or doing a single act in this Commonwealth for such purpose, with the intention of thereby initiating a series of such acts, shall constitute 'doing business.' "[11]

This broader test of doing business was intended by the legislature to expand the judicial definition previously enunciated[12] in the Lutz and Law cases, supra, and under this enlarged legislative standard the activities of the plaintiff may constitute doing business. However, an analysis of the statutory scheme clearly indicates that this amendment was specifically enacted under § 1011, captioned "Service of Process," and not under the Registration Section with which we are now concerned (§ 1001).[13]

The legislature knew how to and did express its intention as to service of

---

9. Accord: Law v. Atlantic Coast Line R. R., 367 Pa. 170, 79 A.2d 252 (1951). See also Partin v. Michael Art Bronze Co., Inc., 202 F.2d 541, 544 (1953) for Third Circuit recognition of these principles.

10. See e. g., Florio v. Powder Power Tools Corp., 248 F.2d 367 (3rd Cir. 1957); Currie v. Chicago Blower Corp., 207 F. Supp. 177 (W.D.Pa.1962); Rayner v. Blank, 189 F.Supp. 471 (E.D.Pa.1960); Mays v. Oxford Paper Co., 195 F.Supp. 414 (E.D.Pa.1961).

11. Act of November 10, 1959, P.L. 1406, § 1, as amended, 15 P.S. § 2852–1011.

12. See Florio v. Powder Power Tools Corp., 248 F.2d 367 (3rd Cir. 1957); Vereen v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co., 209 F.Supp. 919 (E.D.Pa.1962).

13. See also the following cases which allude to or recognize the distinction between these two sections: Florio v. Powder Power Tool Corp., 248 F.2d 367, 370 (3rd Cir. 1957); Andreas v. Imperial Airlines, Inc., 211 F.Supp. 311 (E.D.Pa. 1962).

process. Surely, if it similarly intended to broaden the definition of doing business under the Registration Section, it would have expressly done so.[14] The necessity for precise statement on the part of the legislature is particularly important where, as here, the overruling of a well-established line of definitive decisions by the state's highest Court is involved.

■ Aside from the structure of the statute, the Pennsylvania courts have stated on more than one occasion that the degree of business activity of a foreign corporation must be greater for purposes of licensing than for service of process. See e. g., Shambe v. Delaware & Hudson R. R. Co., 288 Pa. 240, 245, 135 A. 755, 757 (1927); Pharmaceuticals, Inc. v. Hess Brothers, 24 Pa.Dist. & Co. 2d 299, 301–302 (1960). The activities of the plaintiff, therefore, do not meet the more stringent standard of doing business under § 1001 and hence plaintiff is not barred from instituting this suit.

## II
## THE VALIDITY OF THE CONTRACT

As to the merits, defendants make a frontal attack upon the validity of the employment contract on the grounds that (1) it is an unlawful restraint of trade, (2) it lacks consideration, and (3) it lacks mutuality. The cases do not support these contentions.

■ Preliminarily, plaintiffs maintain that the validity of the contract should be determined by the law of Texas because the choice of law provision in the contract specifies that the law of that state shall govern. On the other hand, defendants assert that the law of Pennsylvania should apply. Technically, the law of Texas controls since the enforcement of the contract is not contrary to the public policy of Pennsylvania and the choice of law provision was not adopted for the purpose of evading the otherwise applicatory law. See Lebeck v. William A. Jarvis, Inc., 145 F.Supp. 706, 727 n. 67 (E.D.Pa.1956), and cases cited therein. However, as a practical matter it makes no difference which law applies since the contract is valid under both Pennsylvania and Texas law.

### A. No Restraint of Trade.

■ The general rule in both Pennsylvania and Texas "is that an employee's covenant not to engage in competing business against his employer after the termination of his employment contract, may be enforced if the restriction is reasonable in respect to the time it imposes, the territory it embraced and is reasonably necessary to protect some legitimate interest of the employer in the operation of his business." Ofsowitz v. Askin Stores, Inc., Tex.Civ.App., 306 S.W.2d 923, 924 (1957). See also Martin v. Hawley, Tex.Civ.App., 50 S.W.2d 1105 (1932); Houston Credit Sales Co., v. English, Tex.Civ.App., 139 S.W.2d 163 (1940); Haig v. Gittings, Tex.Civ.App., 260 S.W.2d 311 (1953); City Ice Delivery v. Evans, Tex.Civ.App., 275 S.W. 87 (1925); Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957); Seligman & Latz v. Vernillo, 382 Pa. 161, 114 A.2d 672 (1955); Plunkett Chemical Co. v. Reeve, 373 Pa. 513, 95 A.2d 925, 43 A. L.R.2d 91 (1953). Under the cases cited above, there is no question that the one year time limitation, the product limitation and the eight-county geographical limitation (Bogatin's previously assigned territory) were reasonably necessary to protect the business interests and good will of Chemsearch and do not impose an undue hardship on Bogatin. The harm to Chemsearch from the violation of the agreement—sales already lost, future

14. Under this same reasoning, defendants' contention that by referring to "jurisdiction of the courts" in § 1011 the legislature was referring to access to the courts under § 1014, must also fall. Without deciding whether the provisions of § 1014 are jurisdictional, it is sufficient to state that by the use of the term "jurisdiction" in § 1011, the legislature was only referring to the Service of Process Section.

sales which may be lost, customers which may be lost, unauthorized use of its customer information—is precisely the type of harm which requires the protection of a restrictive covenant, and the decisions so recognize. Chemsearch and its subsidiaries have successfully tested restrictive covenants similar to those contained in Bogatin's contract in six cases, including one in the Western District of Pennsylvania. National Chemsearch Corp. of Missouri and National Chemsearch Corp. of N. Y. v. Morton Fibus and Morley Chemical Co., Inc., No. 61–200 (W.D.Pa.1961).[15]

B. *Consideration.*

■ The consideration flowing to Bogatin in exchange for his covenants not to compete was the full-time employment tendered him by Chemsearch, the customer lists and demonstration kits furnished him, and the specialized training and skills regarding the techniques of selling the product received by him after February 9, 1962. All of these things constituted a bargained for legal detriment since Chemsearch was not obligated to furnish them. And though not essential for legal consideration, these items were considered to be of value by Chemsearch.

The fact that the employment is at will with no notice required for termination by either party does not detract from this conclusion. Ofsowitz v. Askin Stores, supra; Denny v. Roth, Tex.Civ. App., 296 S.W.2d 944 (1956). Cf. Morgan's Home Equipment Corp. v. Martucci, supra; Light Corrugated Box Co. v. Dubison, 26 Pa.Dist. & Co.R. 169

(1936). Nor does the fact that Bogatin began training five days before the contract was signed militate against this conclusion. The understanding of the parties was that Bogatin was not to become a regular employee until he signed the restrictive covenant, and was not to receive any commissions or any customer lists or other confidential information prior to that time. Employment was not past consideration, as defendants contend, but was exchanged at the same time and directly related to the covenants made by Bogatin.[16] Again, this was a legal detriment which plaintiff was not obligated to give prior to the execution of the agreement on February 9, 1962. See Ofsowitz v. Askin Stores, Inc., supra; Houston Credit Sales Co. v. English, Tex.Civ.App., 139 S.W.2d 163 (1940); McAnally v. Persons, Tex.Civ. App., 57 S.W.2d 945 (1933); Bettinger v. North Fort Worth Ice Co., Tex.Civ. App., 278 S.W. 466 (1925); Morgan's Home Equipment Corp. v. Martucci, supra; National Chemsearch v. Fibus, supra.[17]

C. *Mutuality.*

■ Defendants contend that the contract lacks mutuality of obligation and remedy. Mutuality of obligation is an old and seldom used doctrine which is often confused with consideration. In Jessup & Moore Paper Co. v. Bryant Paper Co., 283 Pa. 434, 440–441, 129 A. 559, 562 (1925) it was stated: "'The terms "consideration" and "mutuality of obligation" are sometimes confused. Consideration is essential; mutuality of obligation is not, unless the want of

15. See also the following cases where litigation resulted in consent decrees: National Chemsearch Corp. of N. Y., Inc. v. Sockin, No. 63–3360 (S.D.N.Y.1964); National Chemsearch Corp. Southeastern (Texas Corp.) v. Miller and D & H Supply Co., Inc., No. 3438 (S.D.Miss.1963); National Chemsearch Corp. of Mo. v. Siegel, Wohlner & Precision Laboratories, Inc., & Gerstein, No. 62 C 1810 (N.D.Ill. 1963); Certified Laboratories of Cal., Inc. & National Chemsearch Corp.—Western v. Hurwitz, et al., No. 41000

(N.D.Cal.1963); National Chemsearch Corp. of Mo. (Texas Corp.) v. Schuster, et al., No. C 63–73 (N.D.Ohio 1963).

16. See York Metal & Alloys Co. v. Cyclops Steel Co., 280 Pa. 585, 589, 124 A. 752, 754 (1924).

17. Although the agreement was under seal and stated $1.00 nominal consideration, since this matter is in equity, I chose to examine the realities of the situation.

mutuality would leave one party without a valid or available consideration for his promise. The doctrine of mutuality of obligation appears therefore to be merely one aspect of the rule that mutual promises constitute considerations for each other.'" Since there is good and sufficient consideration here, the contract is not lacking in mutuality of obligation.

█ As for mutuality of remedy, since Bogatin has received the benefits from the contract for two years (i. e., gross commissions of $11,500 in 1962, and $16,-500 in 1963), the positions of the parties have changed so considerably as to give the plaintiff an equity arising out of past performance to insure that Bogatin carry out his promises under the contract. The words of Philadelphia Ball Club, Ltd. v. Lajoie, 202 Pa. 210, 219, 51 A. 973, 974 (1902), still ring true to-day: "The plaintiff has so far performed its part of the contract in entire good faith, in every detail, and it would therefore be inequitable to permit the defendant to withdraw from the agreement at this late day." See also Nolle v. Mutual Union Brewing Co., 264 Pa. 534, 540, 108 A. 23, 25 (1919), and Light Corrugated Box Co. v. Dubison, 26 Pa. Dist. & Co.R. 169, 175 (1936). As the above-cited cases indicate, the doctrine of mutuality has no application to contracts, such as this, which have already been executed by the party seeking performance.

## III

### BREACH OF CONTRACT

█ Without repeating the facts outlined earlier in this Opinion, they indicate that Bogatin has blatantly breached the restrictive covenants contained in the employment agreement and has wilfully given to Madison customer information protected by the agreement.

18. See Harper, "Interference with Contractual Relations," 47 N.W.L.Rev. 873 (1953); Prosser, Torts § 106 et seq. (2nd ed. 1955); 2 Callmann, Unfair Competition & Trademarks § 33.4(d) (2nd ed.

## IV

### LIABILITY OF MADISON

In addition to Bogatin, the injunction should also include Madison for several reasons.

█ First the facts, and inferences derived therefrom, reveal that Madison induced or caused Bogatin to breach his employment contract with Chemsearch. Basic Food Sales Corp. v. Moyer, 55 F. Supp. 449 (W.D.Pa.1944); Raymond v. Yarrington, 96 Tex. 443, 73 S.W. 800 (1903).

Despite the fact that it knew of Bogatin's covenant with Chemsearch, Madison had two of its officers who were present at sales to former Chemsearch customers accompany Bogatin into his old territory. Madison catalogs were sent to persons whom Bogatin revealed to Madison as former customers in his territory. Bogatin's listing of a Madison vice-president's name as salesman on the orders was obvious to Madison. Indeed, the evidence discloses that on at least one occasion Madison's officers noted this practice by Bogatin and said nothing to him about it. Madison paid Bogatin's expenses for trips into his old territory. The nature of the employment agreement which Bogatin signed with Madison wherein Bogatin was required to hold Madison harmless from any suit by Chemsearch is additional grounds for suspicion. The one Madison invoice in the eight-county area which had Bogatin's name on it was altered, with Bogatin's name later erased by employees of Madison.

The entire web of circumstances in this highly competitive business situation leads me to infer that Madison wrongfully participated and continues to participate in the breach of a valid restrictive sales contract.[18]

Secondly, the facts stated above also lead me to conclude that Madison acted

1950). These authors stress the fact that the wrongful inducing or causing the breach of contract element may be readily inferred from business situations similar to the present facts.

in concert with Bogatin with the intent to accomplish an unlawful object and hence is liable as a common-law conspirator. See Fife v. Great Atlantic & Pacific Tea Co., 356 Pa. 265, 52 A.2d 24 (1947). In addition to the reasons give above, under Fed.R.Civ.P. 65(d), dealing with the scope of injunctions, it is stated that an injunction " * * * is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon *those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.*" (Emphasis added.) Complete or adequate relief, therefore, requires that the injunction include Madison as well as Bogatin. The covenant has been violated and the order of the Court would be meaningless if it could be circumvented by the use of another Madison salesman acting for Bogatin and utilizing Bogatin's customer knowledge and contacts. See generally 7 Moore, Federal Practice § 55.13, p. 1675 (2nd ed. 1955.)

## V

## IRREPARABLE INJURY AND SCOPE OF THE INJUNCTION

The present and prospective harm to plaintiff resulting from defendants continuing course of conduct—i. e., sales already lost, future sales which may be lost, customers which may be lost, unauthorized use of its customer information —is not easily measured in monetary terms and falls within the classic definition of irreparable injury stated in Stuart v. Gimbel Bros., Inc., 285 Pa. 102, 108–109, 131 A. 728, 730 (1926): " ' * * * an injunction may issue to prevent wrongs of a repeated and continuing character, or which occasion damages which are estimable only by conjecture and not by any accurate standard. * * * ' "

The cases are legion where injunctions are granted to enforce restrictive employment agreements. See cases cited on 808 of this Opinion, supra.

As to the scope of the injunction which follows in the order, it shall be against both Bogatin and Madison in the eight-county area designated in the contract for a period of one year from the date of this Opinion and Decree. It will not include Harrisburg since the contract did not specifically assign that territory to Bogatin and there is some ambiguity as to whether it was later assigned to him.

Although I have refrained from passing on the issue of divulgence of trade secrets, the evidence at this stage of proceedings seems to strongly point toward liability on this additional ground.

To the extent that what I have said constitutes Findings of Fact and Conclusions of Law, this Opinion shall be considered as containing them. I also affirm, although in different form, plaintiff's Request for Findings of Fact Nos. 1–18, 20, 23–27, 29, 32, 34–39, and plaintiff's Request for Findings of Law Nos. 1–5, 7–13. All other Requests for Findings of Fact and Conclusions of Law not in harmony with those stated in this Opinion are severally denied.[19]

## APPENDIX

### SALES REPRESENTATIVE'S AGREEMENT

THIS AGREEMENT, made and entered into this 9th day of February 1962, between NATIONAL CHEMSEARCH CORPORATION OF NEW YORK, a Texas corporation (hereinafter referred to as "Company"), and Alfred L. Bogatin (hereinafter referred to as "Representative") :

### WITNESSETH :

In consideration of One Dollar ($1.00) and other good and valuable considera-

---

19. Since this is an involved case with voluminous briefs and reply briefs filed by both sides, I have treated in detail as many of defendants' contentions as is possible. Any arguments not specifically mentioned in this Opinion have also been carefully considered.

tions in hand paid by Company to Representative, the employment of Representative upon the terms and provisions herein set forth, the mutual covenants and agreements herein contained and each act done pursuant hereto by either of the parties, it is covenanted and agreed as follows:

1. Company hereby employs Representative, subject to the conditions hereinafter set forth, as a sales representative on a commission basis in the territory specified in Paragraph 4 or such other territory(ies) as Company in its discretion may from time to time assign to Representative (such territory being hereafter referred to as the "assigned territory"). The Commissions to be paid to Representative shall be in accordance with the Commission Schedule of the Company as amended by the Company from time to time. Company may periodically advance to Representative against Commissions earned and commissions to be earned amounts established by the Company from time to time.

2. Representative accepts said employment, and it is agreed that the duties of the Representative shall be such as are from time to time assigned to him by the president, any vice president, secretary, treasurer, sales manager, or office manager of Company.

3. It is expressly recognized and acknowledged by Representative that Company and its affiliated and associated Companies are engaged in the manufacture, distribution and sale of disinfectants, soaps, cleaners, insecticides, chemical specialties, degreasing and sanitary supply and floor maintenance materials and equipment and related products, in substantially all of the states in the continental limits of the United States, including the assigned territory. It is expressly recognized and acknowledged by Representative that (i) Company has developed and established a valuable and extensive trade of its products; (ii) its business connections and customers have been established and maintained at great expense and are of great value to it; (iii) that Representative desires employment by Company and by virtue of such employment Representative will become familiar and possessed of the manner, methods and secrets and confidential information pertaining to such business, including without limitation; sales volume and strategy, number and location of sales representatives, and names and lists of Company's customers and clientele; (iv) by virtue of such employment Representative will become personally acquainted with the customers and trade of Company in the assigned territory; and (v) Company will suffer great loss and damage if, during Representative's employment by Company or at any time subsequent to the termination of such employment, Representative should (a) for himself or on behalf of any other person(s), firm(s), partnership(s) or corporation(s) sell, offer for sale or solicit the sale of disinfectants, soaps, chemical specialties, cleaners, insecticides, degreasing, sanitary supply and floor maintenance materials and equipment in the assigned territory or (b) engage in or enter the employment of or act as a sales agent or broker for the products of or as an advisor or consultant to any person(s), firm(s), partnership(s), or corporation(s) engaged in or about to be engaged in the manufacture, distribution or sale of disinfectants, soaps, chemical specialties, cleansers, insecticides, degreasing, sanitary supply and floor maintenance materials and equipment business in the assigned territory. Representative further recognizes and acknowledges that (i) it will be difficult, if not impossible to compute the amount of such loss or damages, (ii) by reason of Representative's financial circumstances Representative cannot respond in damages in an action at law to compensate Company for such loss or damages, and (iii) Company, accordingly, is without adequate legal remedy in the event Representative violates any of the covenants contained in Paragraphs 4 and 5. Representative acknowledges that the covenants and conditions of this Agreement

are reasonable and necessary for the protection of the Company's business.

4. Representative expressly covenants and agrees that during the term of his employment by Company and for a period of one year immediately following the expiration or termination of such employment for any reason including, without limitation, termination by mutual agreement, (i) he will not at any time for himself or on behalf of any other person(s), firm(s), partnership(s), or corporation(s), sell, offer for sale, or solicit the sale of disinfectants, soaps, cleaners, chemical specialties, insecticides, degreasing and sanitary supply and floor maintenance materials and equipment within the assigned territory, viz:

The following counties in the State of Pennsylvania: Mifflin, Juniata, Perry, Cumberland, Franklin, Adams, Huntingdon and Fulton.

and (ii) he will not in any way, directly or indirectly, for himself or on behalf of or in conjunction with any other person(s), partnership(s), firm(s) or corporation(s), solicit, divert, take away or attempt to take away any of the Company's customers or the business or patronage of any such customers located within said assigned territory. Representative further covenants and agrees that he will not within said period of time, directly or indirectly, engage in or enter the employment of or act as a sales agent or broker for the products of or as an advisor or consultant to any person(s), firm(s), partnership(s) or corporation(s) engaged in or about to become engaged in the manufacture, distribution or sale of disinfectants, soaps, cleaners, insecticides, chemical specialties, degreasing and sanitary supply and floor maintenance materials and equipment within the assigned territory. In the event of the violation by Representative of any one or more of the covenants contained in this paragraph, it is agreed that the term of each such covenant so violated shall be automatically extended for a period of one year from the date on which Representative permanently ceases such violation or for a period of one year from the date of the entry by a court of competent jurisdiction of an order or judgment enforcing such covenant(s), whichever period is later.

5. Representative shall not at any time, either during his employment or after the termination of such employment, divulge to others or use for his own benefit any confidential information obtained during the course of his employment by Company relating to sales, formulae, processes, methods, machines, manufactures, compositions, ideas, improvements or inventions belonging to or relating to the affairs of Company, its subsidiaries, affiliates, successors or associated companies.

6. It is agreed that if Representative's employment by Company is terminated for any reason, no commissions shall be due or payable to Representative on orders secured by him but not shipped as of the effective date of such termination.

7. Representative agrees during the term of said employment that he will devote his entire time and attention exclusively to the business and interests of the Company and that he will perform to the entire satisfaction of the Company, such duties as may be assigned to him and that he will do his utmost to further enhance and develop the business interests and welfare of the Company.

8. This agreement shall be effective upon execution and may be terminated at any time by either party without notice.

9. In connection with Representative's performance of his duties and obligations in the assigned territory, Company is furnishing Representative with sales catalogs, brochures, samples, sample cases, machinery, equipment and other sales aids and will from time to time during Representative's employment furnish additional sales aids. It is understood and agreed that all such property

so furnished Representative is and will remain the property of Company. Representative recognizes and agrees that said sales aids and other property furnished him have been carefully developed by Company over long periods of time at great cost and expense; that because of Company's great expenditures for research and development and for exclusive merchandising tools and methods, great loss and damage will result to Company if said sales aids or other property should fall into the hands of unauthorized persons; that failure to return same in the event of the termination of his employment will cause great loss and damage to the Company; that such loss and damage is difficult, if not impossible to compute. Accordingly, in the event Representative's employment is terminated for any reason, or no reason, Representative agrees to return all such property to Company at its main office, freight collect, and that in the event he fails or refuses for any reason, or no reason, to so return said sales aids and other property to Company, as herein agreed to he will pay to Company at its principal office the sum of $500.00 as liquidated damages and not as a penalty for breach of terms and provisions of this Paragraph.

10. This contract shall be construed under and governed by the laws of the STATE OF TEXAS.

11. The provisions of this contract shall be fully applicable whether Representative is employed by Company, or by any of its subsidiaries, affiliates, successors or associated companies, it being understood and agreed that this Agreement may be assigned without notice at any time and from time to time by Company to or by any of its subsidiaries, affiliates, successors or associated companies. In the event of such an assignment, any such Company to which the Agreement is assigned shall automatically be substituted for the Company executing this Agreement for all intents and purposes and to the same extent as if such assignee were the Company executing this Agreement.

IN WITNESS WHEREOF, Representative has herewith affixed his hand and seal and Company has caused this Agreement to be executed by a duly authorized officer, on the day and year first above mentioned.

NATIONAL CHEMSEARCH CORPORATION OF NEW YORK \
By Leonard Rosenberg
COMPANY
Alfred L. Bogatin (Seal)
REPRESENTATIVE

### ORDER

And now, this 21st day of August, 1964, upon motion of plaintiff for preliminary injunction, and upon due consideration of the evidence and the arguments of counsel for the parties, it is ordered, adjudged and decreed that a preliminary injunction be issued as follows:

1. Enjoining defendant Bogatin, for a period of one (1) year from the date hereof, from:

(a) Soliciting or selling, or attempting to solicit or offer for sale for himself or on behalf of any other person or entity, whether directly or indirectly, any disinfectants, soaps, cleaners, chemical specialties, insecticides, degreasers or sanitary supply or floor maintenance materials or equipment within the area of Mifflin, Juniata, Perry, Cumberland, Franklin, Adams, Huntingdon and Fulton Counties, all within the Commonwealth of Pennsylvania;

(b) Directly or indirectly, for himself or any other person or entity, soliciting, diverting, taking away or attempting to take away any of the customers of Chemsearch or its successors or affiliates or the business or patronage of such customers within the aforesaid territory;

(c) From directly or indirectly engaging in or acting as a sales agent or broker for the products of or advisor or consultant to any person or other entity engaged in or about to become engaged in the manufacture of the products referred to in paragraph (a) hereof within the aforesaid territory insofar as any

such advice, consultation, sales agency or brokerage relates in any way to sales in, customers in, or salesmen selling in the territory referred to in paragraph 1(a).

2. That defendant Bogatin be enjoined preliminarily during the pendency of this action from delivering to Madison Chemical Corporation or any person other than plaintiff, National Chemsearch Corporation of New York, Inc., any customer lists of Chemsearch or copies thereof, or from communicating the contents or parts thereof to any such persons, whether directly or indirectly.

3. That defendant Madison Chemical Corporation be enjoined preliminarily, for a period of one (1) year from the date hereof, from inducing Bogatin, conspiring with Bogatin, directing Bogatin, or in any way participating with Bogatin, either directly or indirectly, in any violation of the restrictive covenant between Bogatin and Chemsearch dated February 9, 1962, or of paragraph 1 of this injunction. Provided, however, that nothing herein shall prevent Madison Chemical Corporation from making sales of products in the territory referred to in paragraph 1 hereof so long as Bogatin shall have no connection, either directly or indirectly, with such sales or solicitation or with the customers within said territory which are solicited or sold or as a sales agent, broker, advisor or consultant to Madison or any of its officers or employees who sell in said territory in connection with any of such customers or solicitations or sales within said territory.

4. That defendant Madison be enjoined preliminarily during the pendency of this action from directing or inducing Bogatin to reveal to it, or soliciting from or receiving from Bogatin, or using in any way, the customer lists of National Chemsearch Corporation of New York, or any copy thereof, or the contents or any part thereof. Madison is further ordered to return to Chemsearch within ten (10) days from the date hereof any such lists or parts thereof which shall have been delivered to Madison by Bogatin prior hereto.

This preliminary injunction is issued upon condition that plaintiff file a bond in the sum of Ten Thousand Dollars ($10,000.00).