USA CHEM, INC., a corporation, Appellant,

v.

Gary Allen LEWIS and Gary Allen Lewis, d/b/a Ger-Chem Industries, Respondents.

No. KCD 28643.

Missouri Court of Appeals, Kansas City District.

Aug. 29, 1977.

Motion for Rehearing and/or Transfer Denied Oct. 12, 1977.

Arlyn D. Haxton, Truman K. Eldridge, Jr., Dietrich, Davis, Dicus, Rowlands & Schmitt, Kansas City, Edwin Tobolowsky, Neal E. Young, Tobolowsky & Schlinger, Dallas, Tex., for appellant.

Bernard Passer, Kansas City, Lyle M. Hanson, Mission, Kan., for respondents.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

HIGGINS, Special Judge.

Action by USAchem to enforce postemployment covenants in its employment contract with Gary Allen Lewis, and for damages for breach of such covenants. Appeal from judgment which denied relief and dissolved a preliminary injunction which restrained the employee from competition with USAchem. There is no question that Gary Allen Lewis violated his employment contract; and the dispositive question is whether restrictive covenants in the contract are enforceable as a reasonable restraint upon his employment. Reversed and remanded.

USAchem is the successor to National Chemsearch Corporation of Missouri. It trains and employs some 1200 commission salesmen, and its business depends upon orders generated by them. Gary Allen Lewis was hired under a standard employment agreement and it provides most of the pertinent facts:

## SALES REPRESENTATIVE'S AGREEMENT

THIS AGREEMENT, made and entered into this 22nd day of August, 1967, between NATIONAL CHEMSEARCH CORPORATION OF MISSOURI, a Texas corporation (hereinafter referred to as "Company"), and Gary Allen Lewis (hereinafter referred to as "Representative"):

### WITNESSETH:

In consideration of One Dollar ($1.00) and other good and valuable considerations in hand paid by Company to Representative, the employment of Representative upon the terms and provisions herein set forth, the mutual covenants and agreements herein contained and each act done pursuant hereto by either of the parties, it is covenanted and agreed as follows:

1. Company hereby employs Representative, subject to the conditions hereinafter set forth, as a sales representative on a commission basis in the territory specified in Paragraph 4 or such other territory(ies) as Company in its discretion may from time to time assign to Representative (such territory being hereafter referred to as the "assigned territory"). The Commissions to be paid to Representative shall be in accordance with the Commission Schedule and Commission Rules and Regulations of the Company as amended by the Company from time to time. Company may periodically advance to Representative against commissions earned and commissions to be earned amounts established by the Company from time to time. * * * The weekly compensation to be advanced by Company to Representative shall be in accordance with Sales Representative's Compensation Agreement attached hereto and made a part hereof. The Company shall have the right to do business in the assigned territory under various trade names. The Company reserves the right to employ other Representatives to solicit and sell in the assigned territory.

2. Representative accepts said employment, and it is agreed that the duties of the Representative shall be such as are from time to time assigned to him · * * *.

3. It is expressly recognized and acknowledged by Representative that Company and its affiliated and associated Companies are engaged in the manufacture, distribution and sale of disinfectants, soaps, detergents, cleaners, insecticides, chemical specialties, paints, water treatments, maintenance chemicals, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment and related products, in substantially all of the states in the continental limits of the United States, including the assigned territory. It is expressly recognized and acknowledged by Representative that (i) Company has developed and established by a valuable and extensive trade of its products; (ii) its business connections and customers have been established and maintained at great expense and are of great value to it; (iii) that Representative desires employment by Company and by virtue of such employment Representative will become familiar and possessed of the manner, methods and secrets and confidential information pertaining to such business, including without limitation; sales volume and strategy, number and location of sales representatives, and names and lists of Company's customers and clientele; (iv) by virtue of such employment Representative will become personally acquainted with the customers and trade of Company in the assigned territory; and (v) Company will suffer great loss and damage if, during Representative's employment by Company or at any time subsequent to the termination of such employment, Representative should (a) for himself or on behalf of any other person(s), firm(s), partnership(s) or corporation(s) sell, offer for sale or solicit the sale of disinfectants, soaps, detergents, chemical specialties, paints, water treatments, maintenance chemicals, cleaners, insecticides, adhesives, glues, paper products for industry and institutions, degreasing, sanitary supply and floor maintenance materials and equipment in the assigned territory or (b) engage in or enter the employment of or act as a sales agent

or broker for the products of or as an advisor or consultant to any person(s), firm(s), partnership(s), or corporation(s) engaged in or about to be engaged in the manufacture, distribution or sale of disinfectants, soaps, detergents, chemical specialties, paints, water treatments, maintenance chemicals, cleansers, insecticides, adhesives, glues, paper products for industry and institutions, degreasing, sanitary supply and floor maintenance materials and equipment business in the assigned territory. Representative further recognizes and acknowledges that (i) it will be difficult, if not impossible to compute the amount of such loss or damages, (ii) by reason of Representative's financial circumstances Representative cannot respond in damages in an action at law to compensate Company for such loss or damages, and (iii) Company, accordingly, is without adequate legal remedy in the event Representative violates any of the covenants contained in Paragraphs 4 and 5. Representative acknowledges that the covenants and conditions of this Agreement are reasonable and necessary for the protection of the Company's business.

4. Representative expressly covenants and agrees that during the term of his employment by Company and for a period of eighteen (18) months immediately following the expiration or termination of such employment for any reason including, without limitation, termination by mutual agreement, (i) he will not at any time for himself or on behalf of any other person(s), firm(s), partnership(s), or corporation(s), sell, offer for sale, or solicit the sale of disinfectants, soaps, detergents, cleaners, chemical specialties, paints, water treatments, maintenance chemicals, insecticides, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment within the assigned territory, viz:

A. The County of Douglas in the State of Nebraska [changed by amendment of November 3, 1967, to Jackson County, Missouri, and supplemented by amendment of April 6, 1970, to assign Wyandotte, Leavenworth, and Johnson Counties, Kansas].

\*    \*    \*    \*    \*    \*

F. Any territory(ies) in which Representative sells, offers for sale, or solicits the sale of disinfectants, soaps, detergents, cleaners, chemical specialties, paints, water treatments, maintenance chemicals, insecticides, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment for Company or one or more of its affiliated and associated companies;

(ii) he will not in any way, directly or indirectly, for himself or on behalf of or in conjunction with any other person(s), partnership(s), firm(s), or corporation(s), solicit, divert, take away or attempt to take away any of the Company's customers or the business or patronage of any such customers located within said assigned territory; and (iii) he will not in any way, directly or indirectly, for himself or on behalf of or in conjunction with any person(s), partnership(s), firm(s), or corporation(s), solicit, entice, hire, employ or endeavor to employ any of the Company's employees. Representative further covenants and agrees that he will not within said period of time, directly or indirectly, engage in or enter the employment of or act as a sales agent or broker for the products of or as an advisor or consultant to any person(s), firm(s), partnership(s) or corporation(s) engaged in or about to become engaged in the manufacture, distribution or sale of disinfectants, soaps, detergents, cleaners, insecticides, chemical specialties, paints, water treatments, maintenance chemicals, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment within the assigned territory. During the term of Representative's employment by Company or any of its subsidiaries, affiliates, successors or associated companies, Representative further agrees not to sell, offer for sale or solicit the sale of disinfectants, soaps, detergents, cleaners, insecti-

cides, chemical specialties, paints, water treatments, maintenance chemicals, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment and any other products of Company in any other territory or area except as provided in this paragraph or any additions or amendments thereto. Representative further expressly covenants and agrees that during the term of his employment by Company and for a period of eighteen (18) months immediately following the expiration or termination of such employment with or without cause, including without limitation, termination by mutual agreement, that he will not at any time for himself or on behalf of any other Sales Representative or former Sales Representative of Company or any of its subsidiaries, affiliates, successors or associated companies, sell, offer for sale or solicit the sale of disinfectants, soaps, detergents, cleaners, insecticides, chemical specialties, paints, water treatments, maintenance chemicals, adhesives, glues, paper products for industry and institutions, degreasing and sanitary supply and floor maintenance materials and equipment and any other products of Company within the assigned or former assigned territory of such other Representative(s). In the event of violation by Representative of any one or more of the covenants contained in this paragraph, it is agreed that the terms of each such covenant so violated shall be automatically extended for a period of eighteen (18) months from the date on which Representative permanently ceases such violation or for a period of eighteen (18) months from the date of the entry by a court of competent jurisdiction of a final order or judgment enforcing such covenant(s), whichever period is later.

\* \* \* \* \* \*

6. Representative shall not at any time, either during his employment or after the termination of such employment, divulge to others or use for his own benefit any confidential information obtained during the course of his employment by Company relating to sales, formulae, processes, methods, machines, manufactures, compositions,

ideas, improvements or invention belonging to or relating to the affairs of Company, its subsidiaries, affiliates, successors or associated companies.

\* \* \* \* \* \*

9. This agreement shall be effective upon execution and may be terminated at any time by either party without notice.

10. In connection with Representative's performance of his duties and obligations in the assigned territory, Company is furnishing Representative with sales catalogs, brochures, samples, sample cases, machinery, equipment and other sales aids and will from time to time during Representative's employment furnish additional sales aids. It is understood and agreed that all such property so furnished Representative is and will remain the property of Company. Representative recognizes and agrees that said sales aids and other property furnished him have been carefully developed by Company over long periods of time at great cost and expense; that because of Company's great expenditures for research and development and for exclusive merchandising tools and methods, great loss and damage will result to Company if said sales aids or other property should fall into the hands of unauthorized persons; that failure to return same in the event of the termination of his employment will cause great loss and damage to the Company; that such loss and damage is difficult, if not impossible to compute. Accordingly, in the event Representative's employment is terminated for any reason, or no reason, Representative agrees to return all such property to Company at its main office, freight collect, and that in the event he fails or refuses for any reason, or no reason, to so return said sales aids and other property to Company, as herein agreed to he will pay to Company at its principal office the sum of $500.00 as liquidated damages and not as a penalty for breach of terms and provisions of this Paragraph.

\* \* \* \* \* \*

12. The provisions of this contract shall be fully applicable whether Representative

is employed by Company, or by any of its subsidiaries, affiliates, successors or associated companies, it being understood and agreed that this Agreement may be assigned without notice at any time and from time to time by Company to or by any of its subsidiaries, affiliates, successors or associated companies. In the event of such an assignment, any such Company to which the Agreement is assigned shall automatically be substituted for the company executing this Agreement for all intents and purposes and to the same extent as if such assignee were the Company executing this Agreement.

\* \* \* \* \* \*

## SALES REPRESENTATIVE'S COMPENSATION AGREEMENT

\* \* \* In consideration of the sum of One Dollar ($1.00) and other good and valuable considerations in hand paid by Company to Representative, the employment of Representative upon the terms and provisions set forth in Sales Representative's Agreement of even date to which this is attached and made a part, mutual covenants and agreements herein contained and each act pursuant hereto by either of the parties, it is covenanted and agreed as follows:

1. By Sales Representative's Agreement to which this is attached and made a part, Company has contemporaneously herewith employed Representative, subject to the conditions set forth in said Sales Representative's Agreement, as a sales representative on a commission basis.

2. Company may weekly advance to Representative against commissions earned and to be earned amounts established by the Company from time to time. Until further notice by Company to Representative, Company shall advance to Representative weekly against commissions earned and to be earned the following amounts:

A. $100.00 per week as salary less applicable Federal withholding tax and Social Security thereon; and

B. $50.00 per week as traveling expense allowance.

3. The Sales Representative's Agreement between Company and Representative of even date herewith and this Sales Representative's Compensation Agreement between Company and Representative constitutes the entire agreement and understanding between Company and Representative. All representations, understandings, stipulations, agreements or promises not set forth in said agreements, shall be null and void and of no further force or effect whatsoever.

IN WITNESS WHEREOF, Representative has herewith affixed his hand and seal and Company has caused this Agreement to be executed by a duly authorized officer, all the day and year first above mentioned.

NATIONAL CHEMSEARCH CORPORATION OF MISSOURI

By s/Martin B. Grossman,
Vice President
COMPANY

s/Gary Lewis      (Seal)
REPRESENTATIVE

At the time of his employment by USAchem, Mr. Lewis had accomplished 2½ years in business school at the University of Missouri. Execution of the standard employment agreement was a condition of his employment. He had no experience in selling chemical products or selling to industrial or institutional accounts.

Following his employment, Mr. Lewis was trained by USAchem in the methods of selling chemical specialties and given product knowledge. He was provided with a list of established USAchem customers containing account history and activity. He grew as a salesman with USAchem from a low of $43,000 in sales in 1968, his first full year, to a high of $94,000 in 1973, his last full year. In 1974 he formed his own company, Ger-Chem Industries. He began selling chemical specialties for his own benefit as early as August 28, 1974, and resigned from USAchem September 10, 1974.

During the 84-month period of employment by USAchem, Mr. Lewis received monthly accounting which covered sales

made, gross commissions earned, advances against commissions, deductions from gross commissions, and net commissions earned. He was paid and accepted all such net commissions.

Since leaving USAchem, Mr. Lewis has solicited and made sales of products similar to and in competition with USAchem's products to customers with whom he had dealt as an employee of USAchem. He has used USAchem's customer lists and information acquired by him while employed by USAchem. USAchem introduced evidence tending to show it was damaged by the postemployment conduct of Mr. Lewis.

USAchem filed this action December 30, 1974, seeking preliminary and permanent injunction enjoining and restraining Mr. Lewis for the 18-month period from competing with USAchem within the assigned territory, and from unfairly competing with USAchem by appropriating and using USAchem's confidential information and trade secrets, including customer lists obtained by Mr. Lewis during his employment by USAchem, and for compensatory and punitive damages. A temporary restraining order was issued as prayed December 31, 1974, and it was served on Mr. Lewis January 4, 1975.

Mr. Lewis answered by general denial February 14, 1975, and hearing on USAchem's application for temporary injunction pending trial on the merits was conducted February 28, 1975. Mr. Lewis stipulated to the execution of the employment agreement, his employment under the agreement for some 7 years, his intentional violation of the post-employment noncompetition covenant, and his intention to continue such violation unless permanently enjoined. The preliminary injunction fully enforcing the contract issued as prayed March 18, 1975, and it was served on Mr. Lewis March 27, 1975.

Following service on him of the preliminary injunction, Mr. Lewis ceased to compete with USAchem in the former assigned territory and continued his sales to new customers in areas adjacent to his assigned territory.

Trial on the merits was conducted beginning November 4, 1975, with Mr. Lewis asserting, as he does here, that his contract with USAchem was not enforceable against him because it lacked mutuality, was a contract of adhesion, was unfair, unconscionable, and void, and its enforcement would impose undue hardship on him. He also asserted a counterclaim which the court denied and is no longer an issue. The court, although concluding as a matter of law, that its temporary restraining order of December 31, 1974, and preliminary injunction of March 18, 1975, were "providently issued," dissolved the injunction and denied all relief to USAchem.

The law on enforcement of covenants of this kind is well settled. Being in restraint of trade, they were first regarded as contrary to public policy and hence invalid. "The reason for such rule was two-fold, * * * injury to the public and injury to the employee. The restraint worked injury to the public by depriving it of the industry to which the employee was best suited, and tended to cast the employee and his family upon the public for support. It also fostered monopolies, prevented competition, and tended to raise prices. * * * The doctrine had its origin at a time when the field of human enterprise was limited, and each man's industrial activity was necessary to the material welfare of his community. Travel was difficult, and the conditions of the times were unfavorable to the migration of persons seeking employment. * * [W]ith the improved facilities for travel, and the growing ability of workers to adapt themselves to different occupations, the reason for the rule disappeared, with the result that the courts began to uphold reasonable restraints on employment on the theory that such covenants were beneficial to * * * the employee for the reason that it enabled him to dispose of his services advantageously, and * * * to the employer because it protected him against a competition which would not otherwise have existed except for the employment. * * * Also important * * * was * * * requiring persons who, by the so-

lemnity of contract, had assumed certain engagements, to observe them. * * * [R]easonableness of the restraint was to be determined according to the particular facts of each case, taking into consideration the subject matter, the situation of the parties, the nature of the business restrained, and the extent of the restraint with reference to time and space. * * * [I]t has been generally held that the restraint must be qualified as to time and space, and not greater than is required for the protection of the person for whose benefit it is imposed." *Renwood Food Products v. Schaefer*, 240 Mo.App. 939, 223 S.W.2d 144, 150–151 (1949). "[T]he question of reasonableness of such a covenant not to compete is not one of fact but of law for the court according to the subject matter of the covenant and the circumstances shown to exist. * * * 'There are certain elements which should always be considered in ascertaining the reasonableness of such agreements in employment cases, among which are the consideration supporting the agreements, the threatened danger to the employer in the absence of such an agreement, the economic hardship imposed on the employee by such a covenant, and whether or not such a covenant would be inimical to the public interest.' * * * It is universally recognized that an employer has a proprietary right in his stock of customers and their good will and, if otherwise reasonable, the courts will protect this asset against appropriation by an employee by the enforcement of such a restrictive covenant not to compete. *Renwood Food Products v. Schaefer*, 223 S.W.2d l.c. 152[4]." *Mills v. Murray*, 472 S.W.2d 6, 11–12 (Mo.App.1971). "[C]ontracts ancillary to employment involving trades or professions are enforceable, though amounting to limited restraint of trade, where such contracts are reasonably limited as to time and space. * * * Such contracts have been held to be valid against assault on the grounds that same are void for want of mutuality. * * * An essential element of such contracts is that the covenant not to compete be reasonably incident to the contract of employment and essential to the protection of the em-

ployer's business and good will." *Arrow Chemical Corp. v. Pugh*, 490 S.W.2d 628, 632 (Tex.Civ.App. Dallas 1973). See also *Willman v. Beheler*, 499 S.W.2d 770 (Mo.1973); *Prentice v. Rowe*, 324 S.W.2d 457 (Mo.App. 1959); *House of Tools and Engineering, Inc. v. Price*, 504 S.W.2d 157 (Mo.App.1973); *American Pamcor, Inc. v. Klote*, 438 S.W.2d 287 (Mo.App.1969); *R. E. Harrington, Inc. v. Frick*, 428 S.W.2d 945 (Mo.App.1968); *Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950 (1960); *Lewis v. Krueger, Hutchinson and Overton Clinic*, 153 Tex. 363, 269 S.W.2d 798 (1954).

The above-quoted cases enforced restrictive covenants against the employee in similar circumstances:

In *Renwood Food Products v. Schaefer*, supra, the employer was in the wholesale frozen food business through commissioned sales representatives. Mr. Schaefer was employed as a salesman and assigned a territory described as "North St. Louis," principally in the County and City of St. Louis. Mr. Schaefer executed an employment contract in which he agreed he would not directly or indirectly engage in the frozen food business within St. Louis City and County, and Madison and St. Clair Counties, Illinois, for one year following termination of his employment with Renwood. After a training period and employment in excess of a year, Mr. Schaefer resigned and went into direct competition with Renwood in St. Louis City and surrounding areas. He defended Renwood's action to enforce the contract's covenants against competition on grounds the contract was void in restraint of trade, unreasonable, unfair and oppressive in preventing him from competing in a territory larger than his assigned territory, no harm to Renwood, and prior breach by plaintiff. The court found the covenant to be "entirely reasonable," and affirmed enforcement of the restriction of time and space imposed on the employee. "Defendant was employed to solicit business from the retail dealers in frozen foods in the north St. Louis territory. His duties were to call upon customers who were already on plaintiff's books, and also to secure new

accounts. In carrying out these duties he would come in personal contact with the customers, and it is reasonable to believe that he would, during the term of his employment, obtain a personal knowledge of and influence over a great many of them, and would be in a position to entice them away from plaintiff in the event he should terminate his employment with plaintiff and set up business for himself or enter the employ of another." 223 S.W.2d l.c. 152[4].

In *Mills v. Murray*, supra, the employer was engaged in business management services for dentists and doctors through management consultants. Mr. Murray was employed as a management consultant and executed an employment contract in which he agreed he would not solicit, contract for or render the same or similar services to any Mills client for three years following termination of his employment with Mills. After a training period and employment of approximately three years, Mr. Murray determined to leave Mills and establish a competing business. While still with Mills, Mr. Murray solicited clients of Mills for his own business until termination of his employment, after which he went into direct competition with Mills. He defended the action by Mills to enforce the contract's covenants contending the covenant was unreasonable as to time. The court found the covenant limitation "reasonably necessary to protect PMM which hired and paid Murray to solicit clients and then, by the very necessities of the business, was required to stand aloof while a relationship of confidence developed between Murray and the customers of the business, thus enhancing the risk that Murray could entice them away when he left PMM's employ. Under the circumstances it was not unreasonable to anticipate that three years must pass before Murray's former clients are no longer subject to the influence of their former relationship. * * [T]he restrictive covenant [is] reasonable to the employer, the employee, not inimical to the public interest and therefore enforceable * * *." 472 S.W.2d l.c. 11–12.

In *Arrow Chemical Corporation v. Pugh*, supra, the employer was in the chemical specialty business through commissioned sales representatives. Mr. Pugh was employed as a salesman to sell chemical supplies to customers in Dallas and Tarrant Counties. Mr. Pugh executed an employment contract virtually identical to the standard contract used by USAchem in which he agreed that during his employment and for eighteen months following termination of employment, he would not compete with Arrow in the sale of similar products in his assigned territory. After training and employment for two years, Mr. Pugh resigned and went into business on his own in competition with Arrow in the former assigned territory. Mr. Pugh, as did Mr. Lewis, admitted execution and performance of the contracts, understanding of the postemployment covenants, and considered the contract unenforceable. The lower court refused to enforce the contract by injunction. Upon review, the judgment was reversed. "The evidence reveals that if a salesman such as appellee does his job properly * * * he can, over a period of time, build up a relationship of cordiality and confidence with the customer which is extremely valuable to both the salesman and his company. * * * It is quite evident * * * that the agreement was essential to the protection of appellant's business. The business [is] highly competitive. Appellee was given special training by appellant to qualify him to sell appellant's products. * * * it can only be reasonably inferred * * * that Pugh was employed by appellant for a period of eighteen months * * * and that during that time * * * he built up a substantial amount of good will and rapport with the customers he called on and that he is now continuing to call upon the same customers in the same territory, selling the same products for another company. * * * The contract * * * is not unreasonable on its face. The territory * * * is not unreasonable nor can it be said that the period of eighteen months agreed upon by the parties is unreasonable as a matter of law." 490 S.W.2d l.c. 631, 632, 633.

■ In the similar circumstances of this case and under the foregoing authorities,

the time and territory limitations imposed by the Lewis covenant were reasonable in protection of his employer's legitimate interests, were not inimical to any public interest, and should have been enforced in equity by injunction.

■ The question of mutuality of the contract in question is answered in *National Chemsearch Corp. of New York, Inc. v. Bogatin*, 233 F.Supp. 802 (E.D.Pa.1964), an action which enforced the same restrictive covenants: "Mutuality of obligation is an old and seldom used doctrine which is often confused with consideration. * * * ' "The terms 'consideration' and 'mutuality of obligation' are sometimes confused. Consideration is essential; mutuality of obligation is not, unless the want of mutuality would leave one party without a valid or available consideration for his promise. The doctrine of mutuality of obligation appears therefore to be merely one aspect of the rule that mutual promises constitute considerations for each other." ' Since there is good and sufficient consideration [1] here, the contract is not lacking in mutuality of obligation. As for mutuality of remedy, since Bogatin [Lewis] has received the benefits from the contract for two [seven] years (i. e., * * * commission * * *), the positions of the parties have changed so considerably as to give the plaintiff an equity arising out of past performance to insure that Bogatin [Lewis] carry out his promises under the contract." 233 F.Supp. l.c. 809–810[7, 8]. See *Decker and Decker Personnel Consultants v. Pigg*, 555 S.W.2d 705 (Mo.App.1977).

■ With respect to application of the doctrine of adhesion to the contract, it is stated in Slawson, "The Standard Form Contract and Democratic Control of Lawmaking Power," 84 Harv.L.Rev. 529 (Jan. 1971): that "A standard form contract is not always adhesive, and the absence of a standard form does not guarantee that the

contract is not adhesive." Here, the contract was a prerequisite to employment, but no one forced Mr. Lewis to accept and execute it. He, at all times, had the option to forego employment with USAchem, but he chose to accept employment in the justified belief it would be mutually gainful. As demonstrated, the contract meets the tests for enforceability; and adhesive clauses are subject to a defense of unconscionableness only when exacted by the overreaching of a contracting party who is in an unfairly superior bargaining position. *Fluor Western, Inc. v. G & H Offshore Towing Co.*, 447 F.2d 35, 39 (5th Cir. 1971). The doctrine does not affect the validity of the contract in question. *National Chemsearch Corp. of New York v. Bogatin*, supra.

■ With respect to undue hardship, it is observed that the restrictions sought to be imposed on Mr. Lewis were fairly and voluntarily assumed by him as a part of a contract, the benefits of which he enjoyed for seven years, *Landau v. St. Louis Public Service Co.*, 364 Mo. 1134, 273 S.W.2d 255, 259 (banc 1954); and it is evidence that Mr. Lewis has had no difficulty utilizing his training and experience to his own subsequent gain.

Inasmuch as the trial court denied enforcement of the contract improperly, it should on remand reconsider whether USAchem was damaged by the actions of Mr. Lewis. *American Pamcor, Inc. v. Klote*, supra, 438 S.W.2d l.c. 292[11]. And inasmuch as the contract provided that " 'In the event of violation by Representative * *, it is agreed that the term of each such covenant so violated shall be automatically extended for a period of eighteen (18) months from the date on which Representative permanently ceases such violation or for a period of eighteen (18) months from the date of the entry by a court of competent jurisdiction of a final order or judg-

---

1. The consideration flowing to Mr. Lewis in exchange for his covenants not to compete was the full-time employment tendered him by USAchem, the customer lists and demonstration kits furnished, the specialized training and

techniques of selling given, and the salary and expense advanced. *National Chemsearch Corp. of New York, Inc. v. Bogatin*, 233 F. Supp. 802, l.c. 809[6].

ment enforcing such covenant(s), whichever period is later'", the court on remand should consider whether further injunctive relief is appropriate. *Arrow Chemical Corp. v. Pugh*, supra, 490 S.W.2d l.c. 630.

Reversed and remanded.

All concur.