AMERICAN AIR FILTER COM-
PANY, INC.

v.

Michael J. McNICHOL and John F.
Scanlan, Inc.

Civ. A. No. 73–1209.

United States District Court,
E. D. Pennsylvania.

Aug. 2, 1973.

Michael M. Baylson, Duane, Morris &
Hecksher, Philadelphia Pa., Ralph B.
Brick, Louisville, Ky., for plaintiff.

John F. Ledwith, Schubert, Mallon,
Walheim & deCindis, Philadelphia, Pa.,
for defendants.

## SUR MOTION FOR PRELIMINARY INJUNCTION

LUONGO, District Judge.

Plaintiff brought suit to enforce a re-
strictive covenant contained in an em-

ployment agreement with a former employee. The matter is before the court now on plaintiff's motion for preliminary injunction. Defendants are Michael J. McNichol, the former employee, and John F. Scanlan, Inc., McNichol's present employer. After hearing and upon pleadings and proof, the court makes the following

## FINDINGS OF FACT

1. Plaintiff, American Air Filter Company, Inc. (AAF), is a Delaware corporation having its principal place of business in Louisville, Kentucky.

2. Defendant Michael J. McNichol (McNichol) is a citizen and resident of the Commonwealth of Pennsylvania.

3. Defendant John F. Scanlan, Inc. (Scanlan) is a Pennsylvania corporation having its principal place of business in Philadelphia, Pennsylvania.

4. AAF is engaged in the manufacture and sale of air cleaning, air moving and air conditioning equipment.

5. AAF's Replacement Products Division manufactures and sells replacement filtering media used in equipment manufactured by AAF and by its competitors.

6. Until about October 1970, AAF sold its replacement filters through independent agents and brokers on a commission basis. In about October 1970, AAF began to set up its own sales force to sell replacement filters in the greater Philadelphia area which consists of Eastern Pennsylvania, a portion of New Jersey and the state of Delaware.

7. Defendant Scanlan has been in the air filtration business in the Philadelphia area since 1949. It sells and distributes both original air cleaning, air moving and air conditioning equipment and the replacement filtering media for such equipment.

8. For a number of years Scanlan has been the largest seller (its sales constituting substantially more than 50%) in the Philadelphia area of original air filtration equipment.

9. Scanlan has maintained records of all installations for which it has sold original air filtration equipment and of all installations for which it had lost out to a competitor on original equipment. Scanlan has had such information available to it as sources of replacement sales.

10. Since the mid-1950's Scanlan has sold replacement filters produced by several manufacturers, including Cambridge Filter Corporation, a direct competitor of AAF in the manufacture of original air filtration equipment and replacement filters.

11. AAF's Philadelphia office and Scanlan are in direct competition with each other.

12. Scanlan employs 19 salesmen who sell both original air filtration equipment and replacement filters and two salesmen who sell replacement filters only.

13. AAF hired its first salesman (George Franz) in the Philadelphia area in the early part of 1971. Two more salesmen were hired by AAF at the beginning of February 1972, McNichol being one of the two.

14. On the day he entered his employment with AAF (February 1, 1972), McNichol signed a written employment agreement. The agreement contained the following paragraph:

"6. The EMPLOYEE agrees that for a period of two years after termination of its (sic) employment with AAF, the EMPLOYEE will not engage either on its (sic) own behalf or on behalf of any other person, firm, corporation or other entity, either directly or indirectly, in any competitive business located or carried on within the Territory above described or take any action whatsoever which may disturb existing business relations of AAF with any person, firm or corporation with whom the EMPLOYEE came in contact as a representative of AAF."

15. The subject of a restrictive covenant had never been mentioned in any discussions between McNichol and AAF representatives prior to the time the

employment agreement was presented to him for signature.

16. Franz was not required to, and did not, sign an agreement containing a restrictive covenant such as that contained in paragraph 6 of McNichol's employment agreement.

17. The "territory" referred to in paragraph 6 of the beforementioned employment agreement is described in paragraph 1 thereof as:

"1. 'Territory' means *counties of Bucks, Berks, Montgomery, Phila., Lehigh, Schuylkill, Lackawanna, Northampton, Monroe, Carbon, Lucerne (sic), Wyoming, Susquehanna, Wayne, Pike, Bradford, Sullivan, Chester & Delaware—Pa.; New Castle, Kent, Sussex—Del.; Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Salem & Mercer—N.J.*"

18. McNichol was assigned to sell in that portion of the "territory" which included the counties of Montgomery, Berks, Lehigh, Schuylkill, Northampton, Carbon, Monroe, Luzerne, Pike, Wayne, Susquehanna, and Wyoming, and a part of the City of Philadelphia.

19. McNichol had been employed as a salesman before going to work for AAF, but he had had no previous experience in the air filtration business.

20. When he started working with AAF, McNichol was given sales literature, AAF catalogues and an IBM list of all AAF air filtration equipment installations in the Philadelphia area. The IBM list was marked confidential.

21. A major part of the technical training given to AAF's salesmen was that given at training courses conducted at AAF's plant in Louisville, Kentucky.

22. Shortly after he was hired, McNichol was invited to attend such a training course, but he was unable to do so because of personal reasons.

23. Almost immediately after he was hired, McNichol started making sales calls. AAF's Eastern sales manager (Robert Reddy) accompanied McNichol on about 20 such calls over a span of four or five days. Following each call, the sales manager would offer a critique and make suggestions for improving the sales presentation.

24. In addition to the calls on which he was accompanied by the sales manager, McNichol was accompanied on calls for three or four days by other AAF salesmen, primarily George Franz.

25. While in AAF's employ, McNichol became familiar with AAF's policies for granting discounts when competitive prices for replacement filters had to be quoted. Such information is regarded by AAF as confidential.

26. Weekly sales staff meetings were held at AAF's Philadelphia office. In such meetings, potential customers for replacement filters were discussed. McNichol attended several such meetings and was thus exposed to information concerning potential customers for replacement filters.

27. McNichol attended two sessions sponsored by AAF at which there was discussion of technical aspects of selling replacement filters.

28. McNichol did not get as much training as is normally given by AAF to its salesmen. As a result of his association with AAF, however, McNichol did gain some knowledge of the business of selling replacement air filters.

29. Very little, if any, of the information learned by McNichol during his employment with AAF constituted trade secrets.

30. Notwithstanding the terms of paragraph 6 of his employment agreement with AAF, on January 19, 1973, McNichol resigned from his sales position with AAF and went to work for AAF's competitor, Scanlan, at a higher salary.

31. Scanlan did not actively induce or persuade McNichol to terminate his employment with AAF.

32. No employee of Scanlan had knowledge of the restrictive covenant in McNichol's employment agreement with AAF until AAF's attorney informed

Scanlan of the covenant on April 10, 1973.

33. McNichol performed essentially the same sales functions for Scanlan as he had performed for AAF.

34. AAF did not hire a salesman to replace McNichol until approximately two months after McNichol left.

35. While McNichol was with AAF, gross sales of replacement filters in his territory were:

**1972**

| | |
|---|---|
| April | $6,500 |
| May | 2,700 |
| June | 8,200 |
| July | 6,900 |
| August | 13,300 |
| September | 7,200 |
| October | 5,800 |
| November | 6,400 |
| December | 10,700 |

36. AAF's sales in McNichol's territory for the few months after McNichol left AAF were:

**1973**

| | |
|---|---|
| January | $12,300 |
| February | 2,900 |
| March | 7,700 |
| April | 5,800 |
| May | 3,100 |

37. Since going to work for Scanlan, McNichol has spent about 5% of his working time attempting to sell replacement filters to customers whom he had solicited for AAF. He has made about 10% of his sales calls for Scanlan in the territory he had earlier covered for AAF.

38. McNichol took no customer lists or other documents belonging to AAF with him when he left AAF.

39. For the only two comparable months for which AAF submitted sales figures (April and May, 1972 and 1973), AAF's replacement filter sales totalled $9,200 in 1972 (when McNichol was selling for AAF), and $8,800 in 1973 (after he left). The reduction in sales after McNichol's departure is relatively insig-nificant, especially in view of AAF's delay in hiring a replacement for McNichol.

40. AAF has failed to establish by a preponderance of the evidence that it has suffered a significant drop in sales resulting from McNichol's departure and his activities on behalf of AAF's competitor, Scanlan.

41. AAF has failed to establish by a preponderance of the evidence that it has suffered, or will suffer, any loss of good-will, or that any of its trade secrets have been, or will be, divulged by McNichol's activities on Scanlan's behalf.

## DISCUSSION

The employment agreement which McNichol signed contains a provision that it is to be construed under the laws of the Commonwealth of Ken-tucky. Assuming the validity of the agreement itself, such a choice of law provision is enforcible in the absence of any indication that the application of Kentucky law would violate any public policy of the Commonwealth of Pennsylvania. Boase v. Lee Tire & Rubber Corp., 437 F.2d 527 (3d Cir. 1970).

In order to prevail on a motion for preliminary injunction, plaintiff must establish not only the probability of ultimate success on the merits, but also that he will suffer irreparable harm *pendente lite* if such relief is denied. A. L. K. Corporation v. Columbia Pictures Industries, Inc., 440 F.2d 761, 763 (3d Cir. 1971); Industrial Electronics Corporation v. Cline, 330 F.2d 480 (3d Cir. 1964); Charles Simkin & Sons, Inc. v. Massiah, 289 F.2d 26 (3d Cir. 1961).

Under Kentucky law (which counsel for both sides concede is essentially the same as Pennsylvania law on the subject) restrictive covenants in employment agreements are enforcible if the restrictions are reasonable as to geographical area and time. Of the cases cited by plaintiff, three, Hall v. Willard & Woolsey, 471 S.W.2d 316 (Ky.1971); Lareau v. O'Nan, 355 S.W.2d 679 (Ky. 1962); and Bradford v. Billington, 299 S.W.2d 601 (Ky.1957), deal with re-

strictive covenants involving a physician who had been brought into the practice of another physician and who had thereby become known to and by the patients of the latter. These cases, in which the personal nature of the service is highly significant, may roughly be characterized as dealing with confidential "customer lists." The only other case cited, Thomas W. Briggs Co. v. Mason, 217 Ky. 269, 289 S.W. 295 (1926), involved a new and unusual type of advertising and promotional business and may, therefore, be described as involving a "trade secret." Two more recent cases, Crowell v. Woodruff, 245 S.W.2d 447 (Ky.1952) and Calhoun v. Everman, 242 S.W.2d 100 (Ky.1951), held unenforcible, covenants not to compete where the jobs involved (in the laundry business) required no special professional or technical skills and where enforcement would have placed a great hardship on the employees' ability to earn their livelihood.

■■ On the foregoing state of Kentucky law, it is not at all clear that plaintiff will prevail ultimately in its effort to enforce the restrictive covenant against McNichol. Further doubt is cast on plaintiff's right to prevail by the uncontradicted testimony that on the day McNichol reported to start work with AAF, which was *after* he had left his earlier employment, he was given a number of papers to sign, including the employment agreement containing the restrictive covenant clause. The subject of restrictive covenants was not mentioned then, and had never been discussed before.

For several reasons, therefore, the merits of plaintiff's case and the probability of ultimate success are open to question. The decision in this case does not, however, turn on the probability or lack of probability of ultimate success, for plaintiff has clearly failed to demonstrate that it will suffer irreparable harm if the preliminary injunction does not issue.

Plaintiff attempted to show that it had given McNichol special training and that it had divulged to him trade secrets and confidential information. The evidence in that regard was not in the least impressive. The evidence disclosed that while technical knowledge is required in the air filtration field for the sale and installation of *new* equipment, the same is not true of *replacement* media. Once air filtration equipment has been installed, specifications for replacement filters are usually contained right on the equipment itself. Concededly some technical knowledge is required in recommending changes in replacement filters from those originally specified, but the range of choice is fairly limited, and the amount of technical knowledge required is, therefore, relatively small.

McNichol received almost no training at all before he began to call on accounts for AAF. What training he did receive apparently dealt more with selling techniques than with technical information relating to air filtration principles. The facts in the instant case differ materially from those in Mixing Equipment Co. v. Philadelphia Gear, Inc., 436 F.2d 1308 (3d Cir. 1971), in which a restrictive covenant was upheld. In the *Mixing Equipment* case, the defendant was an engineer who had been given confidential design and technical engineering application training by plaintiff, which confidential information he used in soliciting orders from his former employer's customers for a competitor.

There is some evidence that in the course of his employment with Scanlan, McNichol has been calling on some customers whom he had solicited for AAF. McNichol admitted that he spent about 5% of his time calling on such accounts. The nature of the replacement filter business is such, however, that the loss involved in a particular sale of replacement filters has little impact beyond the loss of the sale itself. There is no permanent disruption or termination of relations with the customer. Losses for particular sales of replacement filters are easily measurable and are, consequently, capable of compensation by an award of

damages if it be ultimately determined that McNichol has violated a valid restrictive covenant.

In ruling upon a motion for preliminary injunction, the court must consider a balancing of the equities and the possible injuries to the parties by the granting or withholding of the injunction. The controlling principle was stated thus in Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569 (3d Cir. 1959), at p. 594:

> " '[t]he award of an interlocutory injunction . . . [had] never been regarded as . . . a matter of right. . . . [T]he award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences to the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. . . .' [Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L. Ed. 834 (1944)]."

In National Chemsearch Corp. v. Bogatin, 349 F.2d 363 (3d Cir. 1965), this test was applied in reviewing the propriety of the issuance of a preliminary injunction. The facts of that case are set forth in the trial court's opinion, which is reported at 233 F.Supp. 802 (E.D.Pa.1964). Plaintiff Chemsearch had a contract with a salesman which provided that for a period of one year after termination of employment, the defendant salesman would not attempt to take away plaintiff's customers within an eight county area in Central Pennsylvania. The salesman was given one week of training in chemical specialties. The trial court found that soon after termination of employment with Chemsearch the salesman did contact former customers of Chemsearch, sending catalogues of his new employer and soliciting sales in clear violation of the contract. The contract was deemed reasonable under the law of Texas, which was controlling in that case. The District Court held that the past and future loss of sales could not be measured and constituted irreparable harm and therefore issued the preliminary injunction prayed for. The Court of Appeals, without even addressing the merits of the dispute under state law, cited *Bancroft* and vacated the preliminary injunction as an abuse of the trial court's discretion.

A balancing of the equities requires denial of preliminary injunctive relief in this case. All that AAF has demonstrated is that it has suffered a miniscule reduction in volume of sales since McNichol left, and that McNichol has called upon some customers whose identity he had learned of while in AAF's employ. If these actions are ultimately determined to be in violation of a valid restrictive covenant, AAF can be adequately compensated by an award of money damages, not only against McNichol but also against his present employer who was made aware of the terms of that restrictive covenant in April 1973. In contrast, the harm to McNichol by the grant of preliminary injunctive relief is potentially great in that it would substantially impair his ability to earn a livelihood.

The motion for preliminary injunction will be denied.

## CONCLUSIONS OF LAW

1. By reason of diversity of citizenship between the parties, this Court has jurisdiction over the parties and of the subject matter.

2. Plaintiff has failed to establish that it will suffer harm which cannot be compensated by an award of damages if it be ultimately determined that its former employee, McNichol, has violated a valid restrictive covenant.

3. Plaintiff has failed to establish that it will suffer irreparable harm if a preliminary injunction does not issue pending final hearing.

4. Plaintiff is not entitled to the issuance of a preliminary injunction.