**FULLER COMPANY**

v.

**COMPAGNIE DES BAUXITES
DE GUINEE.**

Civ. A. No. 76–688.

United States District Court,
W. D. Pennsylvania.

Oct. 19, 1976.

William Schweers, Pittsburgh, Pa., Luther P. House, Atlanta, Ga., for plaintiff.

Dale Hershey, Pittsburgh, Pa., Peter E. Fleming, Jr., New York City, for defendant.

## OPINION

KNOX, District Judge.

In this case, the court must interpret the scope and meaning of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, enacted into law in the United States as 9 U.S.C. 201 et seq. and the extent of the parties' contractual agreement to arbitrate. On June 5, 1970, Fuller Company, a Pennsylvania corporation, and Compagnie Des Bauxites De Guinee [Hereinafter: CBG], a Delaware Corporation, executed a contract under which Fuller would design, manufacture, and sell a drying and calcining plant and certain related equipment to be used at CBG's bauxite plant in the Republic of Guinea. The equipment was to be manufactured by Fuller in the United States and shipped FOB at Philadelphia.

In April, 1974, Societe de Traction et d'Electricite, S.A. ("Tractionel"), a Belgian corporation retained by CBG as a consulting engineer, issued a draft of a provisional acceptance certificate with certain reservations relating to alleged defects in the equipment supplied by Fuller. Fuller refused to sign this certificate as well as three subsequent drafts of provisional acceptance certificates issued in December, 1974, by Tractionel.

On January 28, 1975, a meeting of representatives of CBG, Tractionel, and Fuller was held in Pittsburgh, Pennsylvania. Fuller alleges that the purpose and effect of this meeting was to settle all outstanding differences of the parties. CBG, on the other hand, alleges that the meeting was solely concerned with the parties' differences over the drafts of the provisional acceptance certificates and that the meeting did not result in any final settlement agreements.

On November 5, 1975, CBG submitted a request for arbitration to the Court of Arbitration of the International Chamber of Commerce seeking indemnification for certain costs related to alleged defects in the equipment supplied by Fuller. Fuller responded on December 29, 1975, but pleaded the alleged January 28, 1975, settlement as a defense. On April 14, 1975, Fuller, filed a petition for a declaratory judgment in the Court of Common Pleas of Allegheny County. Fuller's petition sought a determination of the binding effect of the January 28, 1975, settlement. On May 20, 1975, CBG removed the case to this court.

This opinion will not resolve the underlying claims and disputes between the parties. Rather, the court at this stage of the proceedings is called upon to determine which of three possible forums should proceed with factual hearings on the merits:

(1) This court.

(2) An arbitration panel in Pittsburgh.[1]

(3) The Court of Common Pleas of Allegheny County.

Four motions are pending before the court:

(1) Fuller's motion to strike the supplemental affidavit of John Lambert and the affidavit of Paul DuPont.

(2) Fuller's motion to remand.

(3) CGB's motion for stay of trial and all further proceedings pending issuance of fi-

---

1. While the original contract provided for arbitration in Geneva, Switzerland, the parties have subsequently agreed that arbitration, if ordered, will take place in Pittsburgh, Pennsylvania.

nal award or determination in the arbitration.

(4) Fuller's motion for a preliminary injunction.

### (1) *Motion to Strike Affidavits*

This motion will be denied and the court will consider all of the evidence presented by the parties. While the affidavits of John W. Lambert and Paul DuPont are parol evidence, as Fuller argues, they are clearly admissible under two well recognized exceptions to the parol evidence rule.

 First, the court has the right to consider extrinsic evidence when the terms of a contract are ambiguous. *Keystone Aeronautics Corporation v. R. J. Enstrom Corporation,* 499 F.2d 146 (3d cir. 1974); *Thompson-Starrett International, Inc. v. Tropic Plumbing, Inc.,* 457 F.2d 1349 (3d cir. 1972). Such an ambiguity exists in regard to Fuller's contractual obligation to provide personnel in Guinea—a matter of crucial significance in considering the jurisdiction of this court. (Discussed in detail in Part Two of this opinion). The contract contains the following conflicting provisions, clearly creating an ambiguity:

> "The supervision of erection and the provisions of a chief operator after the start-up of industrial operation are not included.

> Appendix II to the contract.

> Section 6. At the request of the Engineer, the Contractor shall provide the services of an experienced chief erection supervisor and one or more other experienced erection supervisors who shall collectively supply the necessary know-how, technical information and advice for proper off-loading at Port Kamsar, erection, installation and Start-up of Industrial Operation of the Equipment, and who shall give the necessary instructions for such erection and installation to the erection and electrical personnel designated by the Engineer to receive such instructions. The Contractor shall provide the services of such supervisors for such periods as shall have been reasonably requested in writing by the Engineer.

> Section 7. In order to ensure the proper operation of the Equipment after the Start-up of Industrial Operation, the Contractor shall provide the services of a chief operator if so requested in writing by the Engineer, to operate the Equipment for such period as shall have been reasonably requested by the Engineer."

A second exception to the parol evidence rule is that the conduct of the parties may serve to vary the terms of a contract. Under the Uniform Commercial Code, applying to this case under either New York or under Pennsylvania law, courses of dealing, usages of trade, courses of performance, modifications, and waivers may all supplement or alter the written terms of a contract.[2] The affidavits of Lambert and DuPont fall under one or more of these five exceptions to the parol evidence rule.

### (2) *Motion to Remand*

Jurisdiction of this court is invoked by CBG pursuant to the terms of the Conven-

---

**2.** 12A PS § 2–208. Course of Performance or Practical Construction.

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

12A PS § 1–205. Course of Dealing and Usage of Trade

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

While the Uniform Commercial Code does not contain a definition of a modification or a waiver, these concepts clearly apply under 12A PS § 2–209.

tion on the Recognition and Enforcement of Foreign Arbitral Awards, enacted into law by Congress on July 31, 1970, as 9 U.S.C. 201–208. (hereinafter: The Convention). As a contract entirely between citizens of the United States, it is clear that the Fuller-CBG contract meets the jurisdictional requirements of the implementing legislation to the Convention if *any one* of four conditions are met:[3]

(1) The agreement involves property located abroad.

(2) The agreement envisages performance abroad.

(3) The agreement envisages enforcement abroad.

(4) The agreement has some other reasonable relation with one or more foreign states.

No court has yet interpreted the meaning of the Convention as it applies to contracts executed between citizens of the United States. However, some guidance can be obtained from the legislative history of the act.

Mr. Richard D. Kearney, the Chairman of the Secretary of State's Advisory Committee on Private International Law gave the following testimony before the Senate Committee on Foreign Relations (Chaired by Senator Fullbright) on February 13, 1970:

"We have included in section 202 a requirement that any case concerning an agreement or award solely between U.S. citizens is excluded unless there is some important foreign element involved, such as property located abroad, the performance of a contract in a foreign county, or a similar reasonable relation with one or more foreign states. The reasonable relationship criterion is taken from the general provisions of the Uniform Commercial Code. Section 1–105(1) of the code[4] permits the parties to a transaction that bears a reasonable relationship to any other state or nation to specify that the law of that state or nation will govern their rights and duties.

In this connection of course, it should be recalled that what we are dealing with under the Convention is solely a situation in which the parties have voluntarily agreed to arbitration. The Convention and implementing legislation will apply to a transaction only because the parties to that transaction have agreed to settle disputes by arbitration. The provision on choice of law in the Uniform Commercial Code is also based on the same kind of voluntary action by the parties to a transaction. Since the Commercial Code is basic law on commercial transactions in the United States it seemed appropriate to incorporate its test of reasonable relationship into the implementing legislation on foreign arbitral awards." [Footnote

**3.** The jurisdictional section of the statute, 9 U.S.C. § 202, reads as follows:

"An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. *An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.* For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States." (Emphasis added).

The court has also noted that 9 U.S.C. § 201 provides that "the United States of America would apply the convention, on the basis of reciprocity to the recognition and enforcement of only those awards made in the territory of another contracting state". This limitation clearly applies only to the recognition and enforcement of arbitral *awards*; it has no relevance to the problem pending before this court—*whether to order arbitration* under the terms of the convention.

**4.** 12A PS 1–105(1) reads as follows:

"(1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this Act applies to transactions bearing an appropriate relation to this state."

added.] Appendix to S.Rep.No. 702, 91st Cong. 2d Sess. at 6 (1970).

The comments to section 1–105 provide the following explanation of what constitutes a reasonable relationship:

"Ordinarily the law chosen must be that of a jurisdiction where a significant enough portion of the making or performance of the contract is to occur or occurs." 12A PS 1–105, Comment one.[5]

The Pennsylvania Bar Association's Notes to 12A PS 1–105 seem to reflect an even broader definition of the meaning of reasonable relationship:

"Choice of Law. The rules governing the instances in which a Pennsylvania court shall apply the Code are broad—in many instances broader than the 'conflicts' rule which otherwise would be applicable. * * * The Code would make a significant change in the rules of conflict of laws, which are designed to fix a single jurisdiction as the source of the legal rule. Under the Code the forum would apply the Pennsylvania (Code) rule where *any* one of several aspects of the transaction is connected with the state. This broadens the possibility that another forum which has not adopted the Code would apply a different law to the same transaction,—and thereby make the decision turn on choice of the forum."

The court has not discovered any cases decided under 1–105 involving facts similar to those of the case, *sub judice*. The reasonable relationship criteria appears to constitute a flexible standard which the courts apply on a case-by-case basis.[6]

■ Bearing in mind the text of 9 U.S.C. § 202, the statement of Mr. Kearney, and the reasonable relationship standard reflected in 12A PS 1–105, the court has concluded that this contract bears a sufficient connection with the Republic of Guinea to sustain jurisdiction under the Convention.[7] Specifically, the June 5, 1970, Fuller-

---

**5.** Comment one to U.C.C. 1–105 also refers to the discussion of "reasonable relationship" in the case of *Seeman v. Philadelphia Warehouse Company*, 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927). The *Seeman* case refers to contracts bearing "a normal relation to the transaction" and having a "natural and vital connection with the transaction."

**6.** The court notes that a footnote to the case of *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796, 805 (Footnote 17) (1964), indicates that the Supreme Court of Pennsylvania has applied the "grouping of contacts" test from the area of conflicts of laws to U.C.C. 1–105. See statement to this effect by Judge Sheridan in *Tucker v. Capitol Machine, Inc.*, 307 F.Supp. 291 (M.D.Pa.1969). The footnote in *Griffith* is dicta and at any rate 9 U.S.C. § 202 would seem to be related to the general test of reasonable relationship in 1–105 and not to a particular rule of conflicts of law adopted by any given jurisdiction. Therefore, it does not seem necessary or helpful to give a detailed consideration to a grouping of contacts theory of conflicts of law—or any other conflicts theory for that matter—in analyzing the problems in the case *sub judice*.

**7.** Fuller refers to the following testimony of Mr. Kearney before the Senate Committee on Foreign Relations on February 13, 1970 as supporting a much narrower application of the Convention to contracts entered into between citizens of the United States than that adopted by the Court today:

"Does this legislation have any affect whatever on State laws?
Mr. Kearney. No Mr. Chairman, it does not. It concerns in effect solely the jurisdiction of the Federal District courts.
The Chairman. And it does not alter or change a citizen's rights under State laws?
Mr. Kearney. Not at all.
The Chairman. Does it in any way broaden Federal authority?
Mr. Kearney. Not basically. It provides for the right of removal to the district court from the State court in a case that falls under the Convention, but what we are dealing with is foreign commerce which now is fully within the ambit of Federal authority.
The Chairman. Whether or not this comes into effect all depends upon an agreement entered into voluntarily by the parties. Is that correct?
Mr. Kearney. This is correct, sir.
The Chairman. In other words, you are not imposing this on people who do not wish any particular procedure; is that correct?
Mr. Kearney. That is absolutely correct.
The Chairman. So that what you are doing is setting up a procedure by which citizens who would normally be of different countries and who wished to resort to this method of settling their differences could do so; is that correct?
Mr. Kearney. That is correct, sir.
The Chairman. So there is no possible opposition based upon the idea we are now reaching out and subjecting citizens to further arbitrary

CBG contract meets the requirement under 9 U.S.C. § 202 of envisaging performance abroad.[8]

Three letters attached to the affidavit of John W. Lambert indicate that the June 5, 1970, Fuller-CBG contract envisaged that Fuller personnel would provide extensive technical services in Guinea.[9] The European Variation orders, Exhibits D–H of the affidavit of John W. Lambert, indicate that CBG actually paid substantial sums of money to Fuller for the services of engineers and erection supervisors for extended periods of time in 1972 and 1973.[10]

John W. Lambert's affidavit indicates that the total cost of Fuller's technical representatives in Guinea was $269,562.08 (at page 4) while Philip Richter's affidavit in support of motion to remand (at page 3) alleges that the total amount was $192,020.00.

The statements contained in the affidavits submitted in this case differ sharply in regard to the significance the parties attached to overseas technical services when entering into their contract. Philip Richter, manager for project management of Fuller alleges that this technical advice in Guinea was at most a very minor and insignificant part of the contract while John W. Lambert, chief engineer of CBG and Paul DuPont, chief engineer of Tractionel allege that overseas technical services of Fuller were relied upon by CBG in entering into the contract and constitute a crucial part of the bargain.[11] It is not necessary to resolve

---

intervention of the Federal authorities or any other authorities in their private affairs. That is not justified; is that correct?

Mr. Kearney. That is correct.

The basic reason that we propose this legislation and to become party to the convention is because the people engaged in foreign trade consider arbitration is a very economical and speedy way of settling commercial disputes and they are the ones who wanted this."

Appendix to S.Rep.No. 702, 91st Cong. 2d Sess. at 10.

The court interprets this testimony somewhat differently than does Fuller. The main concern of Congress appears to be to avoid an involuntary encroachment of federal authority. In this case, there is no doubt that the parties voluntarily agreed to arbitration. The jurisdictional issue thus relates to whether there are sufficient foreign contacts for the federal, as opposed to the state, court to consider the scope of this voluntary agreement. Thus, the court fails to see how this opinion constitutes an arbitrary encroachment of federal authority.

8. Part one of this opinion discussed an ambiguity in the contract in regard to Fuller's duty to supervise the erection and start-up of the project in Guinea. Consequently, the discussion that follows about extrinsic evidence of the intent of the parties and of the course of performance under the contract is not in violation of the parol evidence rule.

9. Fuller's letter of November 21, 1969 (Ex. B) states:

"We will supply a service engineer to supervise the unloading, storing and erection of the equipment, . . . [P]ersonnel will be furnished for supervision of the commission of equipment."

Fuller's letter of March 20, 1970 (Ex. C) states:

"Fuller Company will furnish general instructions for field welding along with an erection superintendent to supervise the welding and erection."

Fuller's letter of October 24, 1969 (Ex. A) states:

"We are offering a service engineer for the erection supervision of the equipment we are supplying."

10. (a) One electrical engineer (Ex. D), Total cost—$38,400 (U.S. Currency)

(b) One electrostatic precipitator engineer (Ex. E), total cost $22,000.

(c) One delegate from Research Cottrell for supervising erection and start-up of the electrostatic precipitators (Ex. F), Total cost $15,087.50.

(d) One engineer for steam generation, fuel pumping and burning equipment (Ex. G), total cost $26,840.

(e) One Chief Erection Supervisor and one Start-up Engineer, total cost $45,333.

11. Affidavit of Philip Richter in support of motion to remand.

"Fuller's only contact with the operation overseas was limited to the providing of services of certain technical representatives in accordance with separate terms and conditions which were accepted by CBG. Although those technical representatives were at the site during the erection of initial operation of the equipment, Fuller's representatives were not required to manage the actual erection, installation or operation of the equipment. The construction installation was performed by a separate contractor to CBG who had full responsibility for such erection and who reported to CBG's representatives including CBG's engineer. The engineer and CBG were the only entities who had authority to control the erection and authority

this conflict in the evidence. Clearly, extensive overseas technical services were contemplated by Fuller in entering into the contract and were in fact provided.[12]

In addition to the substantial amount of performance of this contract in Guinea already mentioned, a number of other foreign contacts serve to create a "reasonable relationship with one or more foreign states:

(1) Under the original agreement, arbitration was to occur in Geneva Switzerland. Thus, the original agreement envisaged enforcement overseas, although the parties have subsequently agreed to arbitration in Pittsburgh, Pennsylvania.

(2) Section 2(s) of Contract No. 16 requires Fuller to deliver replacement parts to Port Kamsar, Guinea. (Further performance overseas).

(3) Section 2(d)(ii)(1) of Contract No. 16 requires Fuller to be afforded full access and opportunity to recommend modification or adjustments of the equipment in Guinea after the start-up of industrial relations. (Further performance overseas).

(4) Section 2(d)(ii)(5) of Contract No. 16 guarantees Fuller full access and opportunity to recommend improvements of possible defects as to the functioning or manufacturing, during the performance tests of the equipment in Guinea. (Further performance abroad).

(5) To the extent that Fuller had erection responsibilities in Guinea, it is arguable that the contract involves property abroad. But in light of the ambiguity in the contract in this regard and the fact that Fuller shipped the goods FOB Philadelphia, the court places little reliance on this point.

(6) Tractionel is headquartered in Brussels, Belgian and appears to have had important connections with all phases of this contract as witnessed by their attendance at the January 28, 1975, meeting in Pittsburgh, Pennsylvania. Under Section 8.6.2 of Volume I—General Conditions, Fuller was to apply to Tractionel for the issuance from Brussels, Belgian of Provisional and Final Acceptance Certificates.[13]

The motion to remand will therefore be denied.

### (3) *Motion to Stay*

Now that jurisdiction has been determined to properly lie in this court, the question arises as to how it should be exercised. The court will order that arbitration be convened pursuant to the terms of the implementing legislation to the Convention. The defendant's motion to stay trial and all further proceedings pending issuance of final award or determination in the arbitration will therefore be granted.

---

to supervise the actual installation work by the erection contractors. Fuller's technical representatives' sole role and function was to provide technical information about the equipment for the use of the erection contractor."

First Affidavit of Paul DuPont at page 3. "The services of those chief erection supervisors at the construction site were an essential part of Contract No. 16 because neither CBG nor Tractionel had any means to obtain the necessary information, documentation and technical know-how required to erect the equipment supplied by Fuller pursuant to Contract No. 16, in particular, because Fuller was not willing to provide said expertise to Tractionel and CBG other than through the services of the Fuller chief erection supervisor.

Affidavit of John W. Lambert at page 4. "In the course of said negotiations, it became obvious to CBG and Fuller that the provision of such supervisory services in Guinea would be

an essential and indispensable part of Fuller's obligations to be undertaken in Contract No. 16, and said supply of services, which was ultimately agreed, and set forth in Section 6 of Contract No. 16, was a carefully negotiated part of Contract No. 16."

**12.** Fuller argues that 97% of this contract was performed in the United States. The question is not where most of the contract was performed but whether a "significant enough portion of the making or performance" (using the language of the Official comment to UCC 1–105) occurred in Guinea.

**13.** The court is not attempting to draw a precise line where jurisdiction attaches in a federal court under the Convention, nor would it seem possible to do so. But the facts of this case appear to fall within the letter and spirit of the implementing legislation to the Convention.

The main bone of contention in this case is the purpose and effect of the January 28, 1975, meeting of representatives of Tractionel, CBG and Fuller held in Pittsburgh, Pennsylvania. Consideration of events prior to and subsequent to this meeting in some detail is necessary in order to determine whether further proceedings appropriately lie with this court or with an arbitration panel.

Mr. John W. Lambert of CBG in his affidavit in support of motion to stay at page 7, states the purpose of the January 28, 1975, meeting to be the following:

"In order to attempt to resolve the outstanding issues concerning the reservations in the drafts of the Provisional Acceptance Certificates issued in December, 1974, and in order to resolve certain other related issues concerning the payment of the price of the drying and calcining plant by CBG as well as payment by Fuller of the costs of correcting the defects mentioned in the Provisional Acceptance Certificates issued by Tractionel in December 1974, Mr. DuPont of Tractionel sometime late in December, 1974, suggested, and I agreed, that a meeting should be held among CBG, Fuller and Tractionel in January 1975. That meeting was called solely to consider issues related to the payment of the price of the drying and calcining plant and the acceptance by Tractionel and Fuller of a Provisional Acceptance Certificate or Provisional Acceptance Certificates covering the drying and calcining plant."

Mr. Paul DuPont of Tractionel in his first affidavit in support of motion to stay states at page 5, the purpose of the January 28 meeting to be as follows:

"In order for CBG and Fuller to reach an agreement regarding the defects for which reservations had been made in the three Provisional Acceptance Certificates issued by Tractionel in December, 1974, a meeting was held among CBG, Fuller and Tractionel."

In contrast with the above two affidavits, Mr. Philip Richter, in his affidavit in support of Fuller's motion for a preliminary injunction, at page 3, states the purpose of the meeting as follows:

"The purpose of this conference was to close out all disputes, controversies, backcharges and claims between the parties arising out of contract # 16."

On February 10, 1975, Tractionel sent minutes of the meeting to all parties with a cover letter which is attached hereto as Exhibit A.

The parties agree that the money mentioned in numbered paragraphs two and three of Tractionel's letter have been paid. However, provisional and final acceptance certificates and a final acceptance certificate, mentioned in numbered paragraphs 1, 4 and 5 have not been signed.

The reference in numbered paragraphs 4 and 5 to the necessity of signed provisional and final acceptance certificates is in accord with the basic terms of the contract:

"Section 8.4 *FINAL ACCEPTANCE— CLOSING OF CONTRACT*

8.4.1 The CONTRACT shall be considered as being completely fulfilled only on the issue by the ENGINEER of a FINAL ACCEPTANCE certificate endorsed by the Chairman of the C.C.C. and by the OWNER. The said certificate made out according to par. 8.6.2 hereafter shall be delivered within 28 days from the date of expiry (sic) of the Period of Guarantee, as defined in par. 8.5.1 hereafter. Such provisions shall take full effect notwithstanding any previous intervention or taking over by the OWNER. FINAL ACCEPTANCE shall however on no account be granted as long as the corresponding PROVISIONAL ACCEPTANCE has itself not been granted.

8.4.2 The FINAL ACCEPTANCE certificate shall alone signify final approval of the WORKS and shall imply acknowledgment of the proper fulfilment of the CONTRACT. No other certificate shall signify final acceptance of the amount of the CONTRACTOR's claims or of additional WORKS or of variations ordered by the ENGINEER or shall affect the powers of the ENGINEER or put an end thereto."

It appears that the January 28, 1975, meeting may be regarded as having any one of four possible effects:

(1) It may constitute a final settlement of all outstanding claims of the parties as Fuller argues. However, the contract provides for final settlement only after provisional and final acceptance certificates have been signed by all parties and this requirement was affirmed in Tractionel's letter of February 10, 1975. Thus, a final settlement can only be found by virtue of conduct of the parties amounting to a waiver of the terms of the original agreement.

(2) The meeting may constitute a modification of the original agreement concerning the responsibility of Fuller for the alleged defects in the equipment supplied to Guinea.

(3) The meeting may have only served to iron out differences in the wording of the provisional acceptance certificates and thus may not have effected any change in the original contract.

(4) The parties may have discussed problems arising from the contract but reached no conclusions or agreements of any type.

The arbitration clause in the original agreement reads as follows:

"9.7 DISPUTES–ARBITRATION

Should any dispute arise from interpretation or performance of the CONTRACT, the parties shall agree to settle such disputes by arbitration, according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce, of one or several arbitrators designated in conformity with said Rules. Arbitration shall take place in Geneva."

The issue before the court can thus be stated as follows: Is the above language, under applicable legal standards, broad enough to encompass resolution of the four possible conflicting inferences regarding the effect of the January 28, 1975, meeting?

Initially, the court must determine which law to apply in interpreting the scope of the above arbitration clause. While the contract states that the substantive law of the state of New York applies,[14] this provision would seem to be of no effect if New York does not bear a reasonable relationship to the case.

 12A PS 1–105, discussed at length in Part Two of this memorandum, supra, requires that jurisdictions specified in choice of law provisions in contracts bear reasonable relationships to the transaction.[15] The record in this case discloses no connection of New York to the making or performance of this contract other than the retention by CBG of New York counsel. Therefore, Pennsylvania appears to be the *only state* bearing a reasonable relationship to this transaction.

A careful study of Pennsylvania law discloses that the precise issue before this court has not been decided. The court has concluded, however, that the Supreme Court of Pennsylvania would decide that a case of this type should proceed to arbitration.

The Pennsylvania Supreme Court has stated the focus of judicial inquiry in deciding questions of arbitrability to be as follows:

"When one party to an agreement to arbitrate seeks to enjoin the other from proceeding to arbitration, judicial inquiry

14. "9.8 APPLICABLE LAW

The CONTRACT shall in all respects be construed, operate and be interpreted in accordance with the law of the State of New York, U.S.A."

15. In the case of *Boase v. Lee Rubber & Tire Corporation,* 437 F.2d 527, Third Circuit 1970, Judge Aldisert stated that the law of Pennsylvania would appear to approve contractual choice of law clauses. To the same effect see *American Air Filter Co., Inc. v. McNichol,* 527 F.2d 1297, (3rd Cir. 1975) (referring to the *Boase* case at p. 1299) and *American Air Filter Co., Inc. v. McNichol,* 361 F.Supp. 908, E.D.Pa., 1973 (referring to the *Boase* case at p. 911). While these cases do not mention U.C.C. § 1–105, this provision clearly applies to contracts entered into under Pennsylvania law—or to New York contracts for that matter. The reasonable relationship requirement thus qualifies the general approval of choice of law provisions in Pennsylvania.

is limited to the questions of whether an agreement to arbitrate was entered into and whether the dispute involved falls within the scope of the arbitration provision."

*Flighways Corp. v. Keystone Helicopter Corp.,* 459 Pa. 660, 331 A.2d 184 (1975).

■ The court must also be guided by the general judicial presumption in favor of arbitration, as this court has previously stated:

"Under Pennsylvania law, with its favorable policy towards arbitration, doubts as to whether an arbitration clause may be interpreted to cover the asserted dispute should be resolved in favor of arbitration unless the court can state with 'positive assurance' that the dispute was not meant to be arbitrated." *Gavlik Construction Co. v. H. F. Campbell, Co.,* 389 F.Supp. 551, 554 (W.D.Pa.1975)., aff'd in part, 526 F.2d 777 (3d Cir. 1975).

A strong preference for arbitration is also reflected in the legislative history to the Convention.[16]

Two 1975 decisions of the Pennsylvania Supreme Court are of great assistance in analyzing the issues in the case *sub judice,* although not directly on point. *Waddell v. Shriber,* Pa., 348 A.2d 96 (1975) and *Chester City Sch. Auth. v. Aberthaw Construction Co.,* 460 Pa. 343, 333 A.2d 758 (1975). In each case, one of the parties to an arbitration agreement unilaterally terminated the contract. The court held in each case that disputes arising out of the contractual relationship of the parties must be arbitrated, despite the termination.

The Pennsylvania Supreme Court in *Waddell* explained this holding as follows:

"The reasons contracting parties agree to arbitration—the need for a faster means of dispute settlement than the courts can provide and the desire to utilize a less formal and less expensive decisionmaking process—are seldom affected by the termination of the contractual relationship. When parties create a contractual relationship which includes a broad arbitration agreement, they intend to include within the scope of arbitration any dispute arising from the termination of that contractual relationship unless they clearly evidence a purpose to exclude such disputes."

See also two recent decisions of this district in accord with the above two cases. *Kastanias v. Nationwide Auto Transporters, Inc.,* 390 F.Supp. 720 (W.D.Pa.1975) (Marsh, J.); *Zenol, Inc. v. Carblox, Ltd.,* 334 F.Supp. 866 (W.D.Pa.1971) (Knox, J.).

Fuller argues that cases such as *Waddell* and *Chester City* giving broad scope to arbitration agreements should be distinguished from this case on the basis of the language of the arbitration clauses involved. For instance, the arbitration clause in *Chester City* refers to "all claims, disputes and other matters in question *arising out of, or related to* this Contract or the breach thereof." (Emphasis added).

Fuller's argument constitutes a distinction without legal meaning. In the first

---

**16.** The debate on the floor of the House of Representatives on July 6, 1970 reflects that Congress viewed this legislation as saving the time of federal courts and thus promoting judicial economy. Congressman Andrew Jacobs of Indiana made the following comment:

"So far as the expense to the country generally is concerned, it is estimated a great deal of money will be saved, because it (the Convention) will make possible the use of Federal courts here to order arbitration, rather than the use of Federal courts here, which is the present practice, to have full-blown trials. This in net effect would save money." Cong. Rec. Vol. 116 Part 17, p. 22731.
Congressman Hamilton Fish of New York made the following statement:

". . . it is important to note that arbitration is generally a less costly method of resolving disputes than is full-scale litigation in the courts. To the extent that arbitration agreements avoid litigation in the courts, they produce savings not only with the parties to the agreement but also for the taxpayers—who must bear the burden for maintaining our court system.

\* \* \* \* \* \*

(The Convention) is a measure which will reduce the cost of administering our judicial system, as well as contribute to our Nation's commercial life. Under the circumstances, I believe it should be given the full support of the House of Representatives." Cong. Rec. Vol. 116, part 17 p. 22732, 3.

place, no cases are cited which have relied on additional language—such as the related to clause in *Chester City*—not present in the contract between CBG and Fuller. Secondly the agreement between Fuller and CBG to arbitrate all disputes arising from interpretation or performance is very broad and inclusive. Finally, the discussions at the January 28, 1975, meeting were clearly related to the *performance* of the contract and additional language such as that found in *Chester City* is not necessary to encompass these discussions within the scope of the arbitration agreement.

Fuller also argues that settlement agreements should be viewed differently than terminations—or cancellations, modifications or rescissions. The court agrees that this may be true when there is a dispute solely as to the *terms* of such an agreement and not over its existence. Such was the situation in the case of *Morris et al. v. Swan,* 94 Dauph. 142 (1971). In that case, all parties agreed that a 1969 contract had superseded a 1966 contract. 94 Dauph. at p. 143. The court held that the 1969 agreement was a new, independent contract containing no arbitration agreement and that the 1966 arbitration clause was therefore rendered null and void. [17]

*Morris* can therefore be distinguished from *Waddell* and *Chester City* on the existence of a new, independent contract. Fuller's attempt to distinguish between terminations and settlement agreements again is without legal significance. *Waddell* and *Chester City* indicate that broad arbitration clauses encompass disputes arising out of alleged attempts to wind up the agreement of the parties—whether they are called terminations, settlements, rescissions or cancellations does not seem important. The court therefore reads the law of Pennsylvania to be that only a new contract terminates the life of a broad arbitration clause. But when such a settlement agreement is only one of four possible inferences arising from the conduct of the parties at a meeting held in the course of performing the contract, the court predicts that Pennsylvania courts would order arbitration.

Finally, it should be noted that the parties could have agreed upon a time span or a sequence of events—such as termination or settlement—which would cancel the duty to arbitrate. The Pennsylvania courts have not hesitated to uphold such clauses. For instances, in *Emmaus Municipal Authority v. Eltz,* 416 Pa. 123, 204 A.2d 926 (1964), the court held that a clause in the contract stating that a demand for arbitration shall be filed in no case later than the time for final payment indicated that arbitration should be used only during the lifetime of the contract. Arbitration therefore would not survive termination.

This court has recently had occasion to consider the effect of an arbitration clause on work allegedly performed—but not paid for—by a subcontractor. *Gavlik Construction Co. v. H. F. Campbell Co.,* 389 F.Supp. 551 (W.D.Pa.1975) aff'd on this point 526 F.2d 777 (3d Cir. 1975). The court held that the arbitration clause remained in effect after full performance of the contract. The contract had no clause requiring a demand for arbitration before final payment and on

---

17. While this opinion is not going to discuss New York law in detail, it is interesting to note the case of *Application of Minkin,* 279 App.Div. 226, 108 N.Y.S.2d 945 (2d dep't 1951), aff'd 304 N.Y. 617, 107 N.E.2d 94 (1952). Similarly to *Morris,* the court determined the validity of a second contract when the only issue was "whether or not the *cancellation contract* was invalid because of alleged coercion and duress in inducing that contract." (Emphasis added.) The following comment from a concurring opinion supported by three of the five judges is significant:

"If one of the issues to be determined is whether or not an agreement containing an arbitration clause has been cancelled, it must be determined by arbitrators if the language of the arbitration clause is sufficiently broad to express such an intention. (Citation omitted). On the other hand, if, as in the instant case, a claim is made under such an agreement, and there is no dispute as to the fact that it has been cancelled and that all the parties have been released from their obligations thereunder, there are no issues relating to the agreement which remain to be decided, by arbitration or otherwise." 108 N.Y.S.2d at 953.

this basis the case of *Hussey Metal Division v. Lectromelt Furnace Division*, 471 F.2d 556 (3d Cir. 1972), was distinguished. The contract in *Hussey Metals* contained a clause similar to that in *Emmaus* requiring an arbitration demand before final payment.

In the case *sub judice* there is no language terminating the agreement to arbitrate and the arbitration clause is broad and inclusive. The court therefore cannot state with positive assurance that the four possible conflicting inferences arising from the January 28, 1975, meeting are not for a panel of arbitrators to decide.

### (4) Motion for a Preliminary Injunction

Granting of the defendant's motion for a stay of trial renders the plaintiff's motion for a preliminary injunction moot.

---

Division Engineering TRACTIONEL

Vos Références :

Nos Références : PDu/dmo
T.Boké 895.32.16/07.9
Imp. 80.565.B.57

N° : 9329

Extens. Tél. N°

Veuiller nous adresser votre correspondance en double exemplaire, avec mention de nos références

FULLER COMPANY

124, Bridge street

CATASAUQUA, Pa. 18032

USA

FEB 18 1975

1040 Bruxelles, le February 10th, 1975.
Rue de la Science 31

For the attention of Mr. RICHTER.

Gentlemen,

Boke Project - Contract 16 :
Final settlement agreement.

On January 28th, the necessary agreements have been made to close Contract 16. The following remains to be done :

(1) - Signature by FULLER and C.B.G. of the final settlement agreement formalizing the conclusions of our discussions in Pittsburgh. Six copies of subject agreement are attached hereto. Please sign them and return them all to us.

(2) - Payment by FULLER to C.B.G. of $ 60,418.08.

(3) - Payment by C.B.G. of FULLER's invoices 464983, 465221 and 471436. Those have been approved by us and are forwarded to C.B.G. for payment.

(4) - Signature by FULLER and then TRACTIONEL and C.B.G. of the Provisional Acceptance certificates now in your possession.

(5) - Issue by TRACTIONEL, then signature by FULLER, TRACTIONEL and C.B.G., of the Final Acceptance certificates, without reservations, on receipt of the signed final settlement agreement.

./.

cc with attachments to :
- Mr. J.W. LAMPERT, C.B.G./Pittsburgh
- Mr. R.W. HOPPE, C.B.G./Pittsburgh
- Mr. J. VAN DE WERKEN, C.B.G./Pittsburgh

PAGE N°

FULLER COMPANY, CATASAUQUA February 10th, 1975.
For the attention of Mr. RICHTER.

./.

 For your information, we are also appending hereto
a copy of the minutes of our meeting in Pittsburgh, held on
January 28th, 1975.

 P. Dupont E. Marysaael
 Head Engineer Director-Manager