**In the Matter of Muriel EPPINGER, a/k/a Muriel Phelps, Debtor.**

**MERCANTILE BANK AND TRUST CO., Claimant,**

**v.**

**Muriel EPPINGER, Respondent.**

**Bankruptcy No. 84–02925–W–13.**

United States Bankruptcy Court, W.D. Missouri, W.D.

April 29, 1986.

Bruce E. Strauss, Shockley, Reid & Tyson, Kansas City, Mo., for claimant.

Barbara S. Williams, Kansas City, Mo., for debtor.

## FINDING OF FACTS, CONCLUSIONS OF LAW AND ORDER DISALLOWING CLAIMANT'S CLAIM

DENNIS J. STEWART, Bankruptcy Judge.

At issue in this controversy is the enforceability of guarantee agreements which the debtor is alleged to have executed in favor of the claimant and on which a balance is now due of such magnitude that its enforcement in this chapter 13 case would render the debtor's chapter 13 plan impossible and infeasible.[1] The matter came on before the bankruptcy court for hearing on August 15, 1985, whereupon the claimant appeared by counsel, Bruce E. Strauss, Esquire, and the debtor appeared personally and also by counsel, Barbara Williams, Esquire.

The evidence which was then adduced tended to demonstrate the following relevant facts. A document dated November 7, 1977, exists which purports to constitute a guarantee executed by the debtor and her husband in favor of the claimant of the indebtedness of Performance Testing and Consultants, Inc., to claimant.[2] The document purports to bear the signature of the debtor together with that of Charles F. Phelps, her then husband, but otherwise, there is no evidence that the signature is hers, and she testimonially denied in some of her testimony that the signature is hers. Additionally in evidence is a pre-existing guarantee bearing the signature of "Muriel

---

**1.** As it stands now, the claim of the claimant is in the sum of $179,693.73, the amount due from the principal Performance Testing & Consultants, Inc., which the debtor has allegedly unconditionally guaranteed. If this amount is allowed, there can be absolutely no question that debtor cannot formulate a feasible plan. In fact, under § 109(e) of the Bankruptcy Code, the debtor would be ineligible for Chapter 13 relief. Even if only $11,000—the amount of the loan made before the debtor terminated her

guarantee—it could not be paid in any appreciable part if the plan is to be regarded as feasible.

**2.** The loans made to the corporation are the basis for the claim now asserted. See note 1, *supra.* The guarantee instruments provided for "unlimited" liability and made the guarantors personally liable for all debts of the corporation incurred both before and after the making of the guarantee.

Phelps," under the date of October 27, 1977, in which the debtor purports to guarantee payment of "all loans now or hereafter made by Mercantile Bank and Trust Company to Charles F. and Muriel Phelps." Both of the guarantees purporting thus to have been executed by the debtor waive any notice of the extension or renewal of credit [3] and also contain the provision that "[t]his guaranty shall remain in effect ... until such time as Mercantile Bank and Trust Company shall receive in writing notice that the guaranty has been terminated. Termination shall in no way affect, discharge, limit or relieve any guarantor giving notice of termination of liability hereunder with respect to any indebtedness incurred prior to receipt of notice of termination." As of the date of the debtor's institution of the within chapter 13 bankruptcy proceedings, the liability which had attached under the guarantee had mounted to $125,193.11 as of April 26, 1984. It appears from the evidence before the court that the claimant does not seek to enforce the guarantee agreements for the entirety of the balance now due from the principals. The evidence, rather, shows that, in the midst of the course of dealing between the claimant and the principals, the debtor on several occasions wrote to the claimant protesting her liability under guarantees which she contended she did not execute and which were, in her words, "obtained by fraudulent means." [4] On January 8, 1982, she wrote the claimant asking that her liability be terminated. Her letter was to the following effect:

> "My husband, Charles F. Phelps, has informed me that a loan he made with your bank in the amount of $4,500.00 is now paid in full. He and I signed for this loan, with my signing a guarantee for the loan repayment in November 1977. Now that this is repaid I wish the guarantee for repayment to be retired also.

> "I last signed a financial statement for your bank two years ago in order to secure a Master Card for myself. Two months ago, I received a letter from your bank indicating that the limit for that account was to be held in careful check because my credit was not 'that good.' However, I notice that you have felt [sic] to use the same statement to loan my husband many personal loans which exceed my credit limit 4 and 5 times. Therefore, I request that the financial statement also be retired.

> "At this time, I refuse to be responsible for any loan for which I have not personally been consulted with and signed for in approval."

The response from the claimant, over the hand of William P. Messer, vice president, was dated January 14, 1982, and read as follows:

> "I received on January 12, 1982 your letter addressed to the Loan Department concerning loans to Charles F. Phelps.
> "We hold in our files an unlimited guaranty signed by you on October 27, 1977 in which you agree to guarantee all of the borrowings of Charles F. Phelps and any subsequent renewals thereof. Under the terms of that guaranty you have the privilege of terminating your guaranty upon notice however, your guaranty continues in effect for all debt outstanding as of the date of your notice of cancellation on debt of Charles F. Phelps but the principal balance outstanding as of this date is $11,000.00 and under the terms of the guaranty you will remain obligated as a guarantor on that debt until it is paid in full. Our current plans are to convert that balance to a monthly payment note in January, 1982 which will pay out over a period of time not yet agreed upon between Charles Phelps and Mercantile Bank.

---

3. See page 94 *infra*.

4. Her contention that she did not execute the guarantee seems to be limited to the guarantee of November 7, 1977. Her contention that the guarantee was obtained by fraudulent means seems limited to that of October 27, 1977. Under the latter contention, it is fair to subsume the implied assertion that her will was overborne by the duress or coercion applied because of her interest in her husband's economic security.

"The second paragraph of your letter indicates that you desire to have your financial statement retired. Financial statements provided the Bank are given the Bank as a source of information and as such remain in our files until they become obsolete by age or a drastic change in the assets and liabilities of the borrows. [sic] The fact that we have a statement in file with your name on it does not obligate you on borrowing unless you have signed a guaranty or note.

"Before Charles Phelps can borrow in the future it will be necessary for him to provide us a new financial statement which shows only those assets which he owns 100%. Since it is my understanding that most of the assets are jointly owned and since you have also given notice that you will not guaranty additional borrowings in the future it would appear to me at this time that it will not be possible for Mr. Phelps to borrow any additional funds."

Again, on July 1, 1983, the debtor wrote to Mr. Messer in the following vein:

"It has recently come to my attention that you have in your possession a guarantee for Performance Testing and Consultants, Inc. signed by me. Having examined a copy I received last month, I have every reason to be *sure* this document was obtained by fraudulant [sic] means.

"It is also my understanding that you have released two guarantors for Performance Testing and Consultants, Inc. who did have assets, in favor of one guarantor, with *no* assets and my husband, who shares my assets—thereby jeopardizing assets which represent a major investment to me, that is, money held by me prior to my marriage to Mr. Phelps and now invested in a home for my family with him.

"If indeed your bank considered me a guarantor, why did you not inform me before releasing others and putting my money at risk this way? I consider these actions to be mismanagement by your bank.

I respectfully inform you that I am not and have never been financially responsible for Performance Testing and Consultants, Inc."

And once again, on August 31, 1983, the debtor wrote to Mr. Messer as follows:

"It has again come to my attention, that Mr. Charles Phelps is telling people in business that I am a Guarantor for Performance Testing & Consultants, Inc.

"I have not received Receipt for Certified Mail which I should have received by now from your bank indicating that you have received my letter of July 1, 1983. Consequently, I am mailing you a copy along with this letter and the Receipt will be returned to my attorney.

"I am not and have never been a guarantor for Performance Testing & Consultants and after my letter indicating to you that I would not be responsible for anything whatsoever signed by Mr. Charles Phelps, dated January 8, 1982 I know that I am not responsible for anything your bank continues to allow him to sign for.

"Whatever "good faith" you wish to indicate is between you, Mr. Phelps and your dishonest bank employee who claimed to have witnessed my signature on the Guaranty dated November 7th 1977 for Performance Testing. I have never met your bank officers, and it would not be possible for husbands to defraud their wives so readily in legal matters such as these if your bank and others had honest employees."

Therefore, according to the letter of the governing guarantee agreements and the evidence otherwise before the court that the claim of the claimant can be, at most, only for the sum of $11,000. But the debtor disputes her liability for even that sum, contending, as noted above, that she was really not a signatory of the agreements; that they are "fraudulent"; and, on the basis of her above-quoted letters, that the entire arrangement was basically unfair to her. The debtor's denial of having executed the guarantees here in issue—or some of them—may properly be interpret-

ed by this court to indicate that she has forgotten having executed the agreement. (Her testimony otherwise permits an inference that she executed the guarantee of October 27, 1977, at the behest of a bank officer.) And her signatures on the guarantees compare favorably with those on the petition, schedules, and other papers filed by her in this case. According to the uncontradicted evidence which was presented to the court during the hearing, the debtor was not a stockholder of the corporation whose indebtedness she guaranteed. She received some compensation from it, but not on a regular basis.

The particular structure of the several guarantees which were executed by the debtor was unusual: she and her husband, as observed above, guaranteed the liability of her husband's corporation by means of the guarantee of November 7, 1977. Further, in the guarantee of October 27, 1977, the debtor alone, in turn, guaranteed the guarantee of November 7, 1977. Although this particular constellation of contractual liability worked to subject her personal assets to the liabilities of her husband and his corporation, the debtor herself received nothing from the arrangement—according to the uncontradicted evidence—and had very little stake in the loans which were granted except for her interest in the financial security of her husband. And, as she pointed out to the bank in her letter of July 1, 1983, the guarantees had the primary effect of potentially subjecting her separate assets to the bank's claims based on her husband's indebtedness to the bank.

### Conclusions of Law

The evidence which is before this court supports a conclusion that the debtor executed the 1977 guarantee under circumstances which subjected her to a very great magnitude—indeed, an unlimited magnitude—of liability to be incurred in the future by other entities without the necessity of notice to the debtor. Further, according to the uncontradicted evidence of record, the debtor received little or nothing in the

way of a *quid pro quo* for her signing the guarantee. And it is readily apparent that she signed the document without knowing the ramifications to which it subjected her, and did so almost as a matter of negligence and carelessness. This court recognizes that, under the governing law, consideration, independent of that which passes to the principal, does not have to pass to the guarantor as a prerequisite to the validity of the guarantee agreement.[5] But, under similar circumstances, when a guarantor signed a guarantee which resulted in the incurring of massive potential liability many times greater than any benefit which the guarantor or principal received for the guarantee, this court has held the guarantee contract unconscionable insofar as it would subject the guarantor to the liability. See *Smith v. Guaranty State Bank*, 15 B.R. 691, 693 (Bkrtcy.W.D.Mo.1981), in which the following considerations were stated:

"The abovefound facts of the action at bar demonstrate (1) that the form containing the guaranty was a form used and provided by the defendant bank; (2) that the words therein providing for guarantee of the corporation's pre-existing indebtedness were neither prominently displayed thereon nor crystal clear as to their import nor previously explained by the defendant bank; (3) that the pre-existing debt of $246,000 is more than 4 times the new money loaned ($50,000); and (4) that, if the guarantee were enforced according to its literal terms, it would result in a harsh forfeiture of the plaintiffs' residence. Further, and crucially, the facts demonstrate that the debtor corporation was in a desperate financial plight at the time and that, if the plaintiffs were to secure the loan on behalf of the corporation, they generally had to abide the wishes of the defendant bank, who could accordingly virtually dictate the terms of the guaranty agreement. Under such circumstances there is ample precedent for nonenforcement of the contract as a 'contract of adhesion'

---

**5.** The consideration which passes to the principal is sufficient to sustain a contract of guaranty.

or an unconscionable contract. See *U.S.A. Chem, Inc., v. Lewis* 557 S.W.2d 15, 24 (Mo.App.1977) ('[A]dhesive clauses are subject to a defense of unconscionableness only when exacted by the overreaching of a contracting party who is in an unfairly superior bargaining position.'); *J.J. Newberry Co. v. Mixon,* 440 F.Supp. 20, 21 (E.D.Mo.1977) ('An unconscionable contract is one which no man in his right senses would make on the one hand and which no fair and honest man would accept on the other.')."

In this case, as the debtor pointed out to the bank in her letter of January 1982, the bank extended credit to the debtor's principals which greatly exceeded her credit limit. And she figured to enjoy no benefit from these extensions of credit. Her relationship with her husband was used to maneuver her into a position in which she would sign a contract which no person in his or her right mind would sign[6]—one which, as the claimant now contends, would saddle her with an "unlimited" liability wholly without her control or even *knowledge.* Such an unreasonable extraction of all rights from a contracting party without any limiting principle has with some universality been condemned as an unconscionable contract or contract of adhesion.[7] This is especially so when duress or compulsion is suggested by the evidence, as in this case, in which the marital relationship was the relationship providing the leverage for the debtor's affixing her signature to such a one-sided contract.[8]

In this case, furthermore, the evidence is insufficient to establish that, at the time of her execution of the guarantee, the debtor did not have any reason to believe that she would not be granted some notice of the debts for which she would be secondarily liable. In respect to all other imaginable rights to notice—of default, of acceptance of the guarantee by the bank, of presentment, demand, protest, nonpayment and diligence—the guarantee instruments executed by the debtor provide in clear and unequivocal language that she waives any rights to such notices. But, with respect to notice of later-incurred debts, the guarantee is ambiguous. It initially provides for waiver of "notice of indebtedness already or hereafter contracted or renewed," but then goes on to provide for "consent," not with respect to debts initially thereafter incurred, but only with respect to "renewals"—the guarantor "consents without notice to any and all renewals of any said indebtedness or extension of time for the payment thereof." Because one may "contract" for renewal as well as for an initial extension of new credit,[9] these clauses create an ambiguity in the instruments which for at least two reasons, must be resolved against the party who prepared the instrument.[10] Further, the only extrinsic evidence which is available to aid the court in resolving this ambiguity is that contained in the debtor's letter of January 1982 to the claimant, in which she states that it was the intention of the parties to contract only for a single loan of $4500 which had by then already been paid

6. *J.J. Newberry Co. v. Mixon,* 440 F.Supp. 20, 21 (E.D.Mo.1977).

7. "Where a person has been induced to part with a thing of value for little or no consideration, equity will seize upon the slightest circumstance of fraud, duress, or mistake for the purpose of administering justice in the particular case." *Drake v. Greener,* 523 S.W.2d 601, 606 (Mo.App.1975).

8. "It seems to be established as a general rule, at least in this country, that the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the

contract, especially where undue advantage or a threat to do an unlawful injury is shown." *Fizzell v. Meeker,* 339 F.Supp. 624, 627, 628 (W.D. Mo.1970, quoting 25 A.Mur.2d Duress and Undue Influence, section 6, p. 361. Certainly, when the means of leverage is the marriage relationship—delicate in the face of economic threats and yet necessary to defend for societal reasons—this doctrine must be applicable.

9. Viewed in this light, the contract does not provide that consent is waived with respect to new indebtedness contracted after the signing of the guarantee. It is true that this is only one possible construction, but it is sufficient to show the ambiguity of the contract of guarantee.

10. See note 9, *supra.*

back.[11]  In the same letter, she states that she did not in any way expect that her signing the guaranty signified an intention to be bound generally for future debts contracted by the principals.  There is no evidence to contradict her assertions in this regard.  Accordingly, employing the standard rules of contract construction, this court must conclude that the guarantee applied only to the $4500 debt which has already been extinguished by payment.

Therefore, for the foregoing separate and independent reasons (1) that the contracts of guarantee are, under the circumstances, contracts of adhesion and unconscionable and (2) that the intention of the parties, arrived at by applying the standard rules of interpretation and construction, was that the guarantees apply only to an indebtedness now extinguished by payment, it is hereby

ORDERED, ADJUDGED AND DECREED that claimant's claim be, and it is hereby, disallowed.

---

11.  The contention of complete payment in the debtor's letter of January 8, 1982, is not refuted by any other evidence adduced.